Rader *v.* The State.

## W. H. Rader *v.* The State.

1. CRIMINAL LAW. *New trial. Juror a competent witness. When.* Where, in a criminal case, a new trial is sought upon proof showing that a juror had previously formed or expressed an opinion, the juror implicated is a competent witness to deny or explain the charge against him.

2. SAME. *Same. Evidence.* In such a case, it is not error to admit proof of the good character of the juror.

### FROM SULLIVAN.

Appeal in error from the Circuit Court of Sullivan county.   NEWTON HACKER, J.

W. P. GILLENWATERS for Rader.

ATTORNEY-GENERAL LEA, H. H. INGERSOLL, C. R. VANCE and R. R. BUTLER for the State.

Rader v. The State.

McFarland, J., delivered the opinion of the court.

The prisoner has been convicted of murder in the first degree, "with mitigating circumstances," for the killing of W. T. Thomas in Sullivan county. His motion for a new trial was overruled, and judgment pronounced in accordance with the verdict of the jury, sentencing him to imprisonment for life, and from this judgment he has appealed in error to this court.

It is assigned as error that the circuit judge refused a new trial, upon the alleged ground that it was shown after the trial that J. N. Foust, one of the jurors, had in fact prejudged the case, and had expressed a strong opinion against the prisoner. To support the charge against the juror, the prisoner's counsel introduced the affidavit of J. W. Hendrickson, corroborated to some extent by the affidavit of H. C. Yost. To rebut this evidence, the attorney-general was allowed to introduce the affidavit of the juror Foust, denying the conversation and expression attributed to him by Hendrickson, and also the affidavits of several persons as to the good character of said juror Foust.

It is argued that in the case of *Brakefield* v. *The State,* 1 Sneed, it was settled that in such a case the affidavit or testimony of the juror cannot be received upon the question; but a careful scrutiny of that case does not justify the conclusion that the court intended to so hold, although the language of the opinion is very broad. As we understand that case, it was probably not denied that the juror had made

the statements attributed to him; his affidavit was offered to explain the matter, and Judge Totten says, "it is a settled rule that the affidavit of the offending juror cannot be relied on to exculpate himself and prejudice the prisoner." Again, he says: "The juror stands criminated before the court, and in such a case his own affidavit cannot be *credited* or *relied* on when it involves the rights of the accused." In support of this position, Judge Totten refers to the cases of *Hines* v. *The State*, 8 Hum., 602, and *Luster* v. *The State*, 11 Hum., 170.

The first of these cases was where the juror had been guilty of misconduct in separating from the other jurors. It was held that this was ground for a new trial, unless the misconduct was explained and it was shown that no improper communication was made to the juror. And it was further held that the affidavit of the offending juror was not *sufficient* evidence to establish the fact asserted, that is, that the jury was not tampered with during the separation. Judge Green says that his evidence to that effect could not be *relied* upon, because, as he shows, his motives and interests tended to weaken his credit. We do not understand the case to decide that the juror was *incompetent* as a witness upon the question. In the case of *Luster* v. *The State*, Judge Totten says the "explanation cannot be given by the offending juror," but this was a *dictum*, as the point was not involved in that case.

If it was intended to decide, as we think it was, in Brakefield's case that the affidavit of the offending juror was not *sufficient* evidence to exculpate him, there

can be no objection to the decision; but if it was intended to decide that the evidence of the juror is not *competent* on the question, we are constrained to say, that in our opinion the decision is not sound. The question in such a case may be, as it was in this case, whether the juror made the statement or expressed the opinion attributed to him by the attacking witness. We do not see the principle upon which the juror can be pronounced *incompetent* to give testimony upon this question. To hold him incompetent upon the ground stated—that he is in contempt and guilty of misconduct and perjury—is to assume the very question in issue, that is, that he did make the statement. Nor is it any ground to hold him *incompetent* that his motives and interest will prompt him to exculpate himself; his motives and interest may affect his *credibility*, but not his *competency*. If such a rule be established, it will be only necessary for the convicted felon to find some one who will accuse the juror and fix the conversation at a time when no one is present, and as the juror's lips are closed the attack is necessarily successful, unless the character of the witness can be overthrown. There is no positive law making the juror incompetent, and the court cannot arbitrarily reject him. In such a case we see no reason why the court should not hear the juror and all other competent testimony, and decide upon its weight and sufficiency, upon the question in dispute. The severe and very great criticisms of Judge Caruthers, in *Mann* v. *The State*, 3 Head, 375, upon this mode of obtaining new trials, are worthy of high

commendation; and he holds that the evidence impeaching the juror ought to be clear and satisfactory. And as it is apparent that the circuit judge in the present case was not satisfied of the truth of the charge against the juror, a new trial should not be granted for this reason.

Exception is taken to the following passage of the judge's charge: "In considering, however, whether the killing amounts to murder or manslaughter, the instrument with which the homicide was effected must be also taken into consideration, for if it was effected with a deadly weapon the provocation ought to be great indeed to extenuate the offense to manslaughter." This is followed by this further explanation: "If with a weapon or other means not likely or intended to produce death, a less degree of provocation will be sufficient; in fact, the mode of resentment must bear a reasonable proportion to the provocation to reduce the offense to manslaughter. It is not every slight provocation, even by a blow, which will, when the party receiving it strikes with a deadly weapon, reduce the killing from murder to manslaughter." We think this charge is familiar law, well sustained both upon principle and authority. In fact, the charge as a whole is without just ground of criticism, and is to be commended for its clearness and accuracy.

The principal question, however, in this case is, whether the verdict is sufficiently sustained by the testimony set out in the bill of exceptions, which purports to set forth all the evidence heard upon the

trial of the cause. In criminal cases of this grade and character, where the bill of exceptions purports to set out all the evidence, it becomes the duty of this court to closely scrutinize the record, and if the evidence predominates against the verdict, to grant a new trial. The verdict of the jury and the judgment of the circuit judge, while entitled to great weight, does not relieve us from the duty.

The fact of the killing is not denied. It occurred in the store of J. M. Barker, in Bristol, in December, 1879. Without undertaking to set forth the substance of all the evidence, the general circumstances may be stated as follows: W. T. Thomas (the deceased) was a clerk in the employ of Barker, and had been for a short time previous. He and the prisoner, who lived in Bristol, were young men, well known to each other, and, it is to be inferred, were on friendly terms. About a week before the homicide the prisoner came into the store and said to the deceased: "Jimmie said let me have a box of collars and charge it." Deceased understood "Jimmie" to refer to Barker, the proprietor of the store, who was familiarly known by that name, and he let the prisoner have the articles and charged them to him on "a ticket." The prisoner had a brother with whom he lived and who was rendering him assistance, and upon whose credit he sometimes purchased goods, who was also familiarly known as "Jimmie Rader." The proprietor of the store, upon being informed of the manner in which the articles were purchased, denied having given the prisoner authority to get the articles.

The deceased at the time proposed to hunt up the prisoner and settle the matter, but was told by Barker not to do so then; but afterwards, and on the evening of the homicide, he called the prisoner in the store or directed the deceased to do so, and he came in, and Barker took him and deceased behind the counter and asked the prisoner about the purchase, and asked him if he (Barker) had given him permission to get the goods. The prisoner denied having told the deceased that Barker said for him to get the goods, but insisted that he only said "Jimmie," and remarked that any one who said that he had said "Jimmie Barker," told a lie. Barker, who was examined as a witness for the State, relates the affair from that point as follows: "I then said it was a small matter—too small to get mad about; that I wished only to investigate it, and that he had better settle it up. Thomas, Rader and myself then stepped out from behind the counter in front of the door. Next, they had some words, and Thomas called on Mr. Pippin to prove that Rader *had* said it. I then remarked again that it was a small matter, and asked Mr. Rader to walk out of the store, and for Mr. Thomas to go back into the store and quit talking. Thomas walked back, I think about twenty feet, and Rader walked to the steps of the front door, and I thought had gone. Believing the difficulty was over. I walked behind the counter, where we first were, and began to straighten up some hardware. The counter separated me from the parties, and by reason of its having boxes and goods packed on it I

could not see them.    While in this attitude I heard the quarrel begin the second time.    I heard Rader say again that "any one who said that he said 'Jimmie Barker,' told a lie." . Thomas responded that he did not want a difficulty, but that he could whip him if he wanted a difficulty.    I then began to return to the scene of action.    Before I reached the point where I could see them, Thomas said: "Will, if you want to fight, put up your knife and let us fight it fairly."    At this time I could not see them. When I came in view of the contestants they were scuffling over a broom near the door; both had hold of it.    In an instant Thomas fell back along the counter in rather a stooped position—I mean he walked back in a stooped position, for about fifteen feet; he then raised up and turned his face toward Rader and the door.    It was then that Rader advanced on him; it was then I saw the knife in Rader's hand—then I saw Rader make the lick with his right hand; it was then I conceived that he was cut.    He was rather striking over Pippin.    Pippin was in between Rader and Thomas.    Thomas was within reach of Rader when Rader struck the blow. As soon as Thomas was struck, the blood flowed like a hog that was cut. . . . Thomas might have advanced a step from where he turned around to where Rader advanced and struck him."    It is fully proven that deceased received at some time during the altercation a mortal stab on the left side of the neck, from which he died in a few minutes.    There were three other persons, clerks of the house, present at

the time; some of them, however, did not see all that occurred. Some of the facts related by them have reference to parts of the transaction not witnessed or detailed by Barker. From the testimony of the other clerks it may be gathered that during the first altercation the deceased said to the prisoner to put up his knife, or, he need not draw his knife. Pippin says he saw the knife in the prisoner's hand. After the parties came from behind the counter, the deceased called up Pippin and asked him if the prisoner had not said that "Jimmie" told him to get the box of collars, and Pippin said he had. The deceased then walked back in the store. The prisoner walked towards the door, and continued to repeat that whoever said that he said "Jimmie Rader," told a lie. According to some of the witnesses, he was very angry; and in the language of one witness, "ambitious." The deceased was in a good humor and laughing, but said if prisoner would put up his knife he could whip him a fair fight. They then turned and advanced towards each other; it does not clearly appear which turned first, or how far they advanced. There is evidence that about the time the parties turned and advanced on each other deceased asked the prisoner if he called him a liar, and the prisoner replied that he did, and the deceased said he would not take the lie from any one. At any rate, the parties came together. According to some of the witnesses, the deceased stopped first and the prisoner continued to advance. When they met, the deceased pushed the prisoner, who fell to his hands and knees,

and the deceased continued to push the prisoner towards the door, where the deceased got hold of a broom, which the prisoner wrenched from his hand. About this time Pippin got between them, and they were finally separated as before stated, when it was discovered that the deceased was mortally wounded.

It is unnecessary to detail the testimony at any greater length. The material inquiry is, whether this testimony shows sufficient deliberation and premeditation to sustain a verdict of murder in the first degree. When the murder is not committed in the perpetration of, or attempt to perpetrate any of the felonies named in the act of 1829, Code, sec. 4598, then, in order to constitute murder in the first degree, it must be perpetrated by poison or lying in wait, or some *other kind* of wilful, deliberate, malicious and *premeditated* killing; that is to say, the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time—it is enough if it precede

the act; but in all such cases the purpose must be coolly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside. As was clearly pointed out by the circuit judge, if there was provocation of a sufficient character, and the killing was under passion thus excited, it would be manslaughter. But it is not every provocation that will reduce the killing to manslaughter, not even blows under all circumstances, for the resentment must bear a reasonable proportion to the provocation. Nevertheless, although there be no sufficient provocation to reduce the killing to manslaughter, still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree.

It is perfectly manifest that when the prisoner went into Barker's store on the occasion of the tragedy he had then formed no purpose to kill the deceased; they were friendly and there was no difficulty between them. The purpose to kill must have been formed and executed during the brief period that he remained—only a few minutes in all. Was there anything to excite his passion, and was he in a passion in fact? He was asked if he had represented to the deceased that Barker, the proprietor of the store, had authorized him to get the goods. This he denied; and there is no reason to doubt that in what he said to the deceased at the time the goods were purchased the prisoner intended to refer to his brother

"Jimmie Rader." It is equally clear that the deceased honestly understood him to refer to Barker, the proprietor of the store, and to this construction of the prisoner's language the deceased continued to adhere to, and called up Pippin to prove his version of the matter, which Pippin did. This involved a charge against the prisoner of obtaining credit for thirty cents worth of goods by falsely representing that the proprietor of the store had authorized him to do so—to say the least of it, very dishonorable conduct. His denial or explanation seems not to have been readily accepted, although the deceased was in a good humor and acted with moderation, yet he seems to have persisted in his charge against the prisoner and adhered to his construction of the prisoner's language in relation to the purchase of the goods; and he expressed his willingness to fight the prisoner a fair fight, and resent the charge of the prisoner that he had *lied*. Whether or not this ought to have excited the prisoner's passions to such an extent under the circumstances, it seems to admit of but little doubt that it did so. The witnesses clearly indicate that he was in anger and passion, and the quarrel or altercation was not allowed to subside, but was continued and kept up, so that there was no time for the prisoner's passion to cool; on the contrary, the altercation continued until the parties finally came together. We do not say which one actually began the fight; at any rate, during the conflict the fatal stab was given. We are of opinion the proof shows that the purpose to kill was formed and executed in

passion, and there was not that cool, deliberate premeditation required to constitute murder in the first degree. We are not to be understood as expressing any opinion in extenuation of the offense, or upon any question of fact involved in any respect, beyond the single point that this record does not sustain a conviction of murder in the first degree.

Let the judgment be reversed and a new trial awarded.