IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2001

## STATE OF TENNESSEE v. MARTIN STUART HAMMOCK

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-B-1430     Carol Soloman, Judge**

---

**No. M2000-00334-CCA-R3-CD - Filed October 12, 2001**

---

After a trial, Defendant, Martin Stuart Hammock, was found guilty by a Davidson County jury of murder first degree. In accordance with the jury's verdict, the trial court imposed a sentence of life imprisonment with parole. Also accused of murder first degree was a co-Defendant, Brent Rollins, with Angela Watson being indicted for Accessory After the Fact to murder first degree. The co-Defendants were severed prior to trial. In this direct appeal, Defendant contends that: (1) the trial court erred in denying introduction of testimony from the victim's neighbor, David Thompson, regarding the victim's past violent behavior; and (2) the verdict was contrary to the evidence and law in that the proof was insufficient to support a verdict of guilty. After reviewing the record, we reverse, modify and remand the trial court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Reversed, Modified and Remanded.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which DAVID G. HAYES, J., and THOMAS T. WOODALL, J., joined.

Leslie A. Bruce, Nashville, Tennessee, for the appellant, Martin Stuart Hammock.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At trial, Virgie Soapes, sister of Gary Jackson, testified that the victim was 49 years old at the time of his death in February 1998. The victim was employed at the S & S Tire Company. She stated that her brother had a drinking problem for 21 years. When she went to his apartment, she was unable to find his wallet, nor any identification that he usually carried.

On February 16, 1998, about 8:00 a.m., a co-worker, Dewey Alan Brooks testified that he and Tim Southerland stopped by the victim's apartment to take him to work. When there was no

answer to his knock, he looked in the window, saw the television on and the victim laying by a couch between the kitchen and living room. Southerland went through a window and opened the front door then ran across the street to call the police. When Brooks went inside the apartment, he saw blood all over the victim, the floor, the wall and, "it was a total mess."

Tim Southerland testified that he and Alan Brooks stopped by the victim's home to take him to work. Southerland looked through a window and saw blood all over. He went through the window and reached for a phone, but it had been ripped out. He ran across the street to call the police.

Officer Steve Underwood of the Metropolitan Police Department, stated that he received a call to 3812-B Old Hickory Boulevard in Nashville, Tennessee. Some co-workers found a friend inside the house with a lot of blood around him. Upon entry, Officer Underwood found the victim face down on the floor. He backed out of the apartment and secured the scene for the homicide detectives.

Officer Raymond T. Rader, Jr., a Metropolitan Police Department Crime Scene Technician, testified that he took photographs of the crime scene, made measurements for a diagram and lifted several latent prints for possible fingerprint identification.

Stanley Shoemaker testified that on the night of February 15, 1998, at 9:15 p.m., he picked the victim up from Alan Brooks' home then took him home. The victim had been drinking quite a bit.

David Thompson testified that he lived at 3116-A Old Hickory Boulevard in February of 1998. The victim lived next door. On February 15, 1998, about 9:30 p.m., Thompson saw a truck pull up and the victim got out. He heard some doors slamming from next door. About 10:15 p.m., Thompson heard the loud voices of two men from next door. One voice said, "Get the f–k out of my house." Another voice said "no." Thompson walked into his kitchen and heard some rumbling, some banging against the wall and glass breaking. Then there was silence. About 11:15 p.m., Thompson heard a car screeching out of the driveway. The next day, Thompson talked to the police and advised them of what he had heard. Thompson stated that he lived at his apartment for about six months.

Mary Browning testified that she dated Defendant for a few months, knew the victim and had been to the victim's apartment about three or four times. At the time of the victim's death, she and the victim were friends. Also, she knew Brent Rollins and had introduced Rollins to the victim. They appeared to get along fine. On the night of February 15, she talked to the victim on the telephone. She testified the victim said, "Brent and some other guy had come over to his apartment and that he didn't want them drinking his beer, so he really didn't want them to come back. And was -- he sounded kind of down and depressed like he was drunk or whatever. . . . Just that he didn't really want them to come back over there." He said they had gone to get some beer. She stated that she attempted to page Rollins, but was unsuccessful. She talked to Rollins the next day and he said

he was afraid and asked if she had heard that Gary had been killed. Ms. Browning stated that she talked to the police. She told them she did not believe 90 percent of what Rollins said. Also, the victim had said that Rollins might have stolen his radio the week before.

Ashley Hickman, ex-girlfriend of Brent Rollins, testified that she had met the victim and had been to his apartment once or twice. She knew the Defendant as "Bubba." On the night of February 15, about 10:30 p.m., she learned from Rollins that Gary Jackson had been killed. Rollins was scared to call the police and scared of "Bubba." On a job site the next day, she saw Rollins, the Defendant and Angela Watson. She talked to Rollins and they planned to go to the police on Wednesday night. Ms. Hickman stated that she had told her parents about what she knew, and they called the police. She talked to Detective Putnam and told him what she knew and gave him the names of Rollins, the Defendant and Watson. Ms. Hickman testified that Rollins told her that he and Gary were joking around. Gary pushed Rollins. Rollins fell back against the couch and Gary fell on top of him. She stated that Rollins and the Defendant were good friends.

Officer Harmon Hunsicker, a crime scene investigator with the Metropolitan Police Department, testified that he was called to 916 Kippling Drive on February 19, 1998, to assist in the execution of a search warrant. Detective Putnam directed Hunsicker to go to the backyard and take photographs of a burned trash pile. In the burned pile, Officer Hunsicker saw a set of eyeglasses, a utility knife, a set of keys, burned pieces of a phone with wiring attached, and some clothing. Also, the officer took a photograph of a bottle of lighter fluid. Inside the house at this address, Officer Hunsicker took a photograph of a hunting knife in a sheath found in the bottom of a dresser in the bedroom. Also, the officer took photographs of one of the suspects who had a cut on his palm.

Detective William S. Cleek of the Metropolitan Police Department, testified that he met Detective Putnam at 916 Kippling Drive to assist in the investigation of a murder case. Detective Cleek was to secure the residence at this address while a search warrant was obtained. There were no occupants in the residence. Detective Cleek observed a maroon/reddish car coming down Kippling, it slowed or stopped at the driveway of 916, hesitated and drove off. A Channel 2 News cameraman followed the car and was able to obtain the license number.

Officer Michael Alexander, Metropolitan Police Department, testified that he went to 948 Wimberton Drive in response to the broadcast of the car seen at 916 Kippling Drive. Detective Putnam had given Officer Alexander the names of three suspects. The Defendant answered the door and Officer Alexander found Brent Rollins and Angela Watson inside. Officer Alexander detained all three suspects until Detective Putnam arrived. Rollins was placed in Officer Alexander's patrol car.

Darren Brent Rollins testified that he was charged with the murder of Gary Jackson. He has known the Defendant since 1992 and they were real good friends. He has known Mary Browning for two years and met the victim through her. He and the victim became friends and Rollins had been to the victim's apartment six or seven times, where they would sit around and drink. On February 15, 1998, prior to going over to the victim's apartment, he and the Defendant had been

drinking beer. He stated that each of them had consumed about a 12-pack of beer. He testified that they went to Jackson's to look for marijuana, because Jackson had put him in touch with people to get marijuana in the past. He and the Defendant arrived at the apartment at approximately 10:30 p.m. The victim did not know the Defendant prior to that evening. They sat around drinking beer that they brought with them and the victim drank his own. Rollins described the victim as being intoxicated. The name of Mary Browning came up, which he supposed got the Defendant's attention.[1] They ran out of beer, so he and the Defendant went to the store to buy some more. When they returned, Rollins asked the victim for his half of the money for the 12-pack, but the victim refused. Rollins told the victim they were leaving, so the victim got mad and he and Rollins exchanged a few words. Rollins testified that he told the victim, "kiss my ass." Rollins stated that he was standing by the couch and the Defendant was sitting in a chair across the room. The victim shoved Rollins, who fell over the couch.

Rollins testified that he saw the Defendant grab the victim from behind and strike him on the top of the head with a knife handle. Rollins had not seen the knife before. The victim kept putting his hands on top of his head. The victim fell and the Defendant put his foot in the middle of the victim's back, grabbed the top of his hair, pulled the victim's head back and cut his throat. Rollins stated that he was in a state of shock and did not do anything to stop the attack. Afterwards, he and the Defendant retrieved a trash bag from the top of the refrigerator, and put the telephone, a plate and an ashtray into the bag. Rollins and the Defendant did not discuss why the Defendant assaulted the victim. They left the apartment in Watson's car. He and the Defendant got into an argument about what happened. He threatened to kill Rollins and his family if he said anything about the incident. During this encounter, the Defendant cut Rollins on the palm of his hand. When they got to Watson's house, they took the trash bag and its contents into the house. The Defendant told Watson that he had killed someone, but did not say who it was. Watson gave them some lighter fluid and the Defendant suggested that they burn their clothes and the items in the trash bag. Rollins stated that he and the Defendant burned these items in a trash pile in the backyard. Later, Rollins told Ashley Hickman over the telephone what had happened. They discussed plans to tell the police, however, he could not get out of the presence of the Defendant. For the next two days, Rollins worked with the Defendant and spent the night at Watson's house. On Wednesday night, Rollins stated that they drove by Watson's house and they saw the police, so they drove to the Defendant's mother's house. While at this house, he was arrested and told Detective Putnam what happened in the victim's apartment. Rollins is hoping that with his testimony he might get a lighter sentence for his charge. When shown a utility tool, Rollins stated that he had not seen it before and that the victim did not have a knife that night.

During cross-examination, Rollins testified that he had bought marijuana from the victim, but would not call him a drug dealer. Rollins denied that he had taken the victim's radio the week before and that this was the reason the victim became angry. Rollins acknowledged that he had been to the victim's apartment on several occasions, but this was the first time the Defendant had been there. Rollins denied he told Watson that "if Bubba hadn't killed him I'd be dead." Also, Rollins

---

[1] The Defendant and Mary Browning had apparently dated in the past.

denied that the Defendant told Watson it was self-defense or that he was protecting him from the victim. Again, Rollins testified that he did not remove a "letterman's knife" from the victim's hand and put it in the trash bag.

Brad Putnam, a detective with the Metropolitan Nashville Police Department, testified that he observed the victim at the scene on February 16, 1998. There was blood on the wall about three feet above the body, and a bloody palm print. The phone was missing and also the victim's wallet. Detective Putnam talked to a neighbor who had overheard arguments from the apartment. He interviewed Mary Browning from whom he learned about Brent Rollins. She informed Detective Putnam that Brent Rollins and another subject had gone by the victim's apartment the night before. On February 18, Detective Putnam received a call from Ashley Hickman, the girlfriend of Rollins, in which she stated that Rollins and "Bubba" had gone over to the victim's apartment that night. Also, Ms. Hickman told him about Angela Watson's home at 916 Kippling Drive and that some items were burned in a trash pile in the back yard. Based upon this information, Detective Putnam obtained a search warrant for 916 Kippling Drive. In the back yard, he found the burned trash pile and certain items were recovered, particularly a set of keys and a utility-type tool.[2] Inside the house, in a bedroom dresser, Detective Putnam found a white, bone-handled hunting knife. Also, recovered was some marijuana and a black leather coat. Detective Putnam heard about the car driving by and that the three persons inside were Brent Rollins, the Defendant and Angela Watson.

Detective Putnam proceeded to the Wimberton address and talked to Rollins in the rear of a patrol car. Rollins told Detective Putnam what happened in the apartment on the night of February 15th. When he talked to the Defendant and Watson, they denied knowing anything about the death of Gary Jackson. All three were arrested and transported to Metropolitan Police Department Homicide Division. At the police department, the Defendant gave a video statement in which he admitted killing the victim. In this statement, the Defendant contended that the victim attacked Rollins with a knife.

In the video statement played for the jury, the Defendant stated that he had driven to the victim's apartment with Rollins. They were in Watson's car. The Defendant did not know or had not seen the victim before that night. He stated that Rollins and the victim got into an argument over the purchase of some beer they had gone to get. The Defendant stated that the victim attacked Rollins with a small knife and it looked like he was going to cut Rollin's throat. The Defendant began hitting the victim in the head with the knife found at Watson's house. The victim reared back and grabbed the Defendant. The Defendant cut the victim's throat. The only reason he did so was to protect Rollins. The Defendant stated that Rollins cut the phone line and they took the bag with them. At Watson's house, the Defendant told her what happened. Rollins got some lighter fluid from Watson, but she did not know what was going on. He burned some items in the back yard, including the Defendant's shirt. The Defendant admitted cleaning the knife in the sink and his leather coat in the bathtub.

---

[2]Detective Putnam described the utility tool as a multiple-type tool, and when opened, it contains pliers, screwdrivers and a knife blade.

Detective Putnam stated that the latent prints obtained at the scene were not capable of being matched with any person, nor was there any blood found on any evidence seized from the Watson's home. The keys found in the burned trash pile matched the victim's front door.

Dr. Bruce P. Levy, a medical examiner for Metropolitan Nashville Davidson County, testified that he performed an autopsy on the victim on February 16, 1998. The victim had sustained a multitude of injuries to the head and neck. Also, the forearms and hands had what appeared to be defensive wounds. Dr. Levy determined that the victim died from a sharp cut to the neck resulting in a great loss of blood. It was his opinion that the victim lived from two to five minutes after his throat had been cut. The cut severed the jugular veins, the larynx and was deep to the neck bone. It was Dr. Levy's opinion that a person stood behind the victim and pulled the knife from the left around to the right side of the neck. The victim had a blood alcohol level of .24.

On behalf of the defense, Angela P. Watson testified she that has known the Defendant since high school. They renewed their acquaintance in November of 1997. She stated that she met Brent Rollins who worked with the Defendant in December 1997. On February 15, 1998, she and the Defendant were at home, when Rollins and Ashley Hickman came by. That evening the Defendant had been drinking. He and Rollins left about 9:00 p.m. and returned about 11:00 p.m. She was asleep on the couch when the Defendant woke her up. He was very agitated and upset. Rollins was a little bit agitated. Both the Defendant and Rollins made statements as to why they were upset. Rollins stated that he had been in fear of his life earlier that evening. The fear was not of the Defendant. Rollins and the Defendant were very good friends and the Defendant would protect Rollins when he got involved in confrontations. She stated that the next morning while eating breakfast, Rollins showed her Gary Jackson's driver's license. When asked about the victim's physical threat to Rollins on Sunday night, the following dialogue occurred:

Q. Did Brent Rollins ever make a statement to the affect that Gary Jackson was a physical threat to him on Sunday night?

A. Yes.

Q. Can you recall what he said?

A. He said, if it happened that way, I'd be dead, Angie.

Q. Did he make any other statements to that affect?

A. He said Gary Jackson was a mean and violent man.

Q. Did he say how he knew Mr. Jackson was a mean or violent man?

A. He said he had -- he told me he had been in trouble too, in that nature.

Q.     Did he specify what kind of trouble that was?

A.     No.


Ms. Watson acknowledged that she was charged with accessory after the fact of murder first degree, but she did not destroy any evidence, nor harm anyone. She admitted she did furnish the lighter fluid. She admitted she knew about the death and saw the Defendant's jacket in the bathtub, but denies she saw any blood or telling Detective Putnam that the water turned pinkish. The night they drove by her house, the Defendant was driving and Rollins told him to get them out of there. They went to the Defendant's mother's home. She admitted that she told Detective Putnam that she did not know anything about Jackson's death on their first meeting.

In rebuttal to Watson's testimony, Virgie Soapes testified that her brother, Gary Jackson, did not have a driver's license. His license had been suspended for several years due to a DUI conviction, which is why he did not own a car. Also, to her knowledge, her brother did not have an identification license.

LEGAL ANALYSIS
PART A
FIRST AGGRESSOR RULE

The Defendant asserts that the trial court erred in denying him the right to bring forth certain relevant evidence concerning the victim's past through the testimony of David Thompson, the neighbor. Thompson's unbiased testimony would establish: (1) that Jackson had a propensity and reputation for violent behavior; (2) that Jackson was the aggressor in the fight that led to his death; (3) that Jackson was an experienced fighter, which would have had bearing on Jackson's ability as an older and smaller man to be a formidable opponent in a physical altercation; (4) which the jury could consider in assessing the necessity and reasonableness of Defendant's actions regarding the physical injuries inflicted pertaining to the issue of self-defense and defense of co-Defendant; and (5) which the jury would consider in evaluating Defendant's state of mind which was an essential element of the crime charged and of the lesser-included offenses.

This proposed testimony came about during the cross-examination of David Thompson, a neighbor, concerning noises that he heard in the past coming from the victim's apartment. The transcript reflects:

By defense counsel:

Q.     All right. When you talked to the police, did you discuss with them any other noises or arguing or fighting, things that you consider as arguing or fighting that had gone on over in that apartment?

A.       Yes.

Q.       And what kind of things did you tell the detective?

A.       I just said, there was usually -- it was a common thing to hear them arguing over there.  That's what I told them.

*  *  *  *  *

The Court:       I just heard the word arguing.

The Witness:     To be honest with you, I meant yelling and fighting.  I mean loud noises.  I have never seen an actual fight over there.  But I have heard yelling and things of that sort.

Ms. Bruce:       Okay.  And loud noises?

The Witness:     And loud noises.

Ms. Bruce:       Such as?

The Witness:     Such as --  it's been two years ago ma'am.  You're going to have to give me some leeway.

Ms. Bruce:       Loud noises, banging, as you say, like two men fighting, scuffling.

The Witness:     To be honest with you, I really couldn't remember.  I had to listen to the tapes to remember most of the stuff I remember today.


The trial court sustained the State's objection that the defense had failed to establish the issue of self-defense to permit testimony as to the victim's past history as a first aggressor.  However, the court advised defense counsel that it may be able to re-call witnesses.

At the conclusion of the State's proof in chief, the State advised the trial court that it had introduced evidence of its own that the victim, Gary Jackson, was in fact, the first aggressor.  Thus, there is no need to call witnesses to establish that fact, since the State concedes that the victim was a first aggressor.  Furthermore, the witness, Thompson, does not have sufficient information to know exactly what went on next door, merely from the presence of loud noises and arguments.  The Defendant contends that the evidence is admissible to corroborate the Defendant's claim of self-defense.  Furthermore, the evidence is relevant, Rule 404.

The trial court ruled the issue is not relevant, the question of the first aggressor has been admitted and raised and would not offer help to the jury in this case. The trial court did not permit the remainder of the witness, Thompson's, cross-examination.

As a general rule, character evidence to prove conduct is inadmissible. Tenn. R. Evid. 404(a). However, there are certain exceptions to this rule. Exceptions: in pertinent part:

(2) Character of Victim. Evidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Rule 405 sets forth the methods of proving character.

(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a reasonable factual basis exists for the inquiry; and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Several Tennessee appellate decisions have addressed the question of the "first aggressor" or the "true aggressor" in determining whether a victim's background contains evidence of violence. In *State v. Butler,* 626 S.W.2d 6, 11, (Tenn. 1981), the supreme court addressed the deceased's (victim) state of mind as to her animosity towards her estranged husband, the Defendant. Butler had dropped his children at the home of his estranged wife, the victim, when they exchanged words. Butler contended that when his wife approached the mobile home and returned to talk to him, as he had requested, he saw a gun barrel sticking from under her crossed arms. Butler shot and killed his wife in self-defense. The trial court had excluded the testimony of Ms. Solchenberger, that four days prior to the shooting, the victim had told her "no, that she wanted a divorce but that Bobby (Defendant) wouldn't give her one, and went on to say "(she was going) to get rid of that son-of-a-bitch one way or another." When asked what she meant, Mrs. Butler opened her purse and showed a white-handled .22 caliber pistol." This threat was not communicated to the Defendant, but the witness was permitted to testify that the victim had a pistol in her purse. The Court held that the character of the deceased for violence, as well as her animosity toward the Defendant, as indicated by words and actions at the time of the killing and before, are proper matters for consideration of the jury upon the question of self-defense. (Citations omitted.) In some cases where self-defense is an issue, uncommunicated threats made by a deceased against a Defendant are admissible as going to the state of mind of the deceased. (Citations omitted.) However, the applicability of this rule is limited, and it becomes operative only where relevant to explain the conduct of the deceased in establishing who was the aggressor. Reversed for a new trial.

In *State v. Barnes,* 675 S.W.2d 195, 197 (Tenn. Crim. App. 1984), this Court found that the trial court erred in excluding the victim's reputation for violence in the determination of who was the first aggressor. The Defendant had gone to the aid of a friend whom the Defendant had threatened to beat. The Defendant struck the deceased in the jaw, and the victim died from a head injury when his head struck the floor of the bar.

In *State v. Furlough,* 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990), this Court addressed the distinction between the Defendant being unaware of a victim's prior acts of violence and if a Defendant is aware of the prior violent acts. This Court held that if the Defendant was unaware of prior acts of violence by the victim, the evidence is admissible for corroborative purposes only. If the Defendant is aware of the prior violent acts, he may so testify. *State v. Hill,* 885 S.W.2d 357, 361, (Tenn. Crim. App. 1994), *perm. app. denied,* (Tenn. 1994).

In *State v. Ruane,* 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995), Judge Wade speaking for this Court undertook an analysis of the Tennessee Rules of Evidence and prior authorities on the admissibility of a victim's specific acts of violence and reputation for such acts. Judge Wade stated:

Although a recent Tennessee decision, *State v. Furlough,* suggested that the victim's past specific violent acts can also be used to corroborate testimony that the victim was the first aggressor, it is doubtful if, under Rule 405(a), the Tennessee Rules of Evidence would permit this other than on cross-examination. Despite *State v. Furlough's* statement that such evidence is not used to prove that the victim acted in accordance with a character trait, the use of specific acts to prove first aggression is character proof of the victim's propensity for violence. This type of evidence is not authorized on direct testimony under the Tennessee Rules of Evidence.

From this, and upon concluding that any violent nature on the part of the victim was not essential to the defense, we have determined that the new rules would limit use of the proffered evidence here to cross-examination of the victim. And, of course, that would have been impossible in this instance due to the death of the victim. Thus, the evidence was properly excluded if offered for anything more than mere corroboration. (Cite omitted.)

This Defendant, unaware at the time of the shooting to a specific instance of prior violent conduct by the victim, nonetheless sought to introduce the incident through the testimony of a third person. Under *Hill,* this evidence could have been used to circumstantially corroborate the Defendant's claim that the victim was the first aggressor. The prior conduct was not an essential element of a defense, however, and thus, by the rationale in *Ray* was not admissible as substantive proof by the terms of Rule 405(b).

In this case, the Defendant did not know the victim, nor had he seen the victim prior to the night of February 15, 1998. Thus, the Defendant would not have any knowledge of any prior specific acts of violence on the part of the victim, nor of the victim's reputation of such acts. Through his video statement to Detective Putnam, the Defendant stated that he acted to protect Brent Rollins, in that the victim was threatening Rollins with a knife. There is nothing in the trial record that reflects that two persons, Mary Browning or Brent Rollins, had informed the Defendant of the victim's past history. The Defendant contends that the cross-examination of David Thompson, a next door neighbor, would corroborate a claim that the victim was a violent person. In analyzing the proffered testimony of David Thompson, the most this witness can say is that he heard loud noises coming from the victim's apartment in the past. He does not know the source of these noises, which might indicate some fighting and arguing. He cannot say who might have been an aggressor or exactly what these encounters entailed. We cannot say, even circumstantially, that such proposed testimony rises to specific acts of violence on the part of the victim. Notwithstanding this analysis, the State conceded that on the night in question, the victim started the scuffle between he and Rollins. Thus, the victim was the first aggressor between he and Rollins. Also, the defense witness testified that Rollins had informed her, after the event, that the victim was a mean and violent man. Thus, the jury had some information before it that the victim may have some questionable past concerning some violence. In conclusion, we agree with the trial court that the proposed cross-examination of the witness, David Thompson, was not relevant. There is no merit to this issue.

PART B
SUFFICIENCY OF THE EVIDENCE

In this issue, the Defendant contends that the evidence at trial is insufficient to establish the essential elements of premeditation to support a conviction for first-degree murder. The Defendant infers that, at most, the evidence would establish second-degree murder, citing *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992).

Tennessee Rule of Appellate Procedure 13(e) prescribes that "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, S. Ct. 2781, 2789 (1979); *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). Also, a conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt. On appeal, a convicted criminal bears the burden of showing that the evidence was insufficient. *McBee v. State*, 372 S.W.2d 173, 176 (Tenn. 1963); *State v. Buggs*, 995 S.W.2d 102, 105-06 (Tenn. 1999).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Smith v. State*, 24 S.W.3d at 279. The court may not "reweigh or re-evaluate the evidence" in the record below. *State v. Buggs*, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. *State v. Tuggle*, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Morris*, 24 S.W.3d 788, 795 (Tenn. 2000); *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The indictment in this cause alleges that on February 15, 1998, the Defendant and Darren Brent Rollins intentionally and with premeditation did kill Gary Jackson in violation of Tenn. Code Ann. § 39-13-202. Thus, this indictment sets forth the essential elements necessary for a jury to make a determination, based upon the evidence beyond a reasonable doubt, that the Defendant did, in fact, commit first-degree murder. First-degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). As set forth in Tenn. Code Ann. § 39-13-202(d), premeditation is defined as:

> [A]n act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill

-12-

must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

A death caused by the intentional act of another is presumed to be second-degree murder. *State v. Brown*, 836 S.W.2d at 543. Thus, the State must prove, beyond a reasonable doubt, the elements of premeditation in order to elevate the offense to first-degree murder. *Id.* The elements of premeditation are questions for the jury and may be inferred from the circumstances surrounding the killing. *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), *perm. to appeal denied,* (Tenn. 1994). Although there are no strict standards governing what constitutes proof of premeditation, several relevant circumstances are helpful in the inquiry, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declarations by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. *State v. Bland,* No. 02C01-9412-CR-0028 (Tenn. Crim. App. at Jackson, Mar. 27, 1996), *reh'g denied,* (Tenn. Crim. App. May 1, 1996); *State v. Brown*, 836 S.W.2d at 541-42. Additional factors from which the jury may infer premeditation include planning activities by the Appellant prior to the killing, the Appellant's prior relationship with the victim, and the nature of the killing. *Id.* (citing *State v. Bordis,* No. 01C01-9305-CR-00157 (Tenn. Crim. App. at Nashville, Feb. 24, 1995), *perm. to appeal denied*, (Tenn. July 10, 1995)(quoting 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* Sec. 7.7 (1986))); *State v. Gentry*, 881 S.W.2d at 4-5)(citations omitted).

In essence, the Defendant contends that the rapidity in the manner in which the murder was carried out negates the concept of cool reflection, judgment and calmness without passion and provocation. The State, on the other hand, asserts that the evidence is sufficient to support the verdict by arguing "that the defendant had time to reflect upon and choose a course or action when he first sprung to the defense of Rollins, and again when he brandished his hunting knife, and again each time before he struck the victim . . . ." The proof at trial showed that the victim, Rollins and the Defendant all got into an argument over Defendant's failure to pay for his share of the beer they were consuming. After the victim shoved Rollins over the couch, the Defendant immediately assaulted the victim with his knife handle. Although the State argues that the repeated blows were evidence of premeditation, our supreme court has held that "the fact repeated blows were inflicted upon the victim is not sufficient, by itself, to establish first-degree murder." *State v. Brown,* 836 S.W.2d at 542. "Repeated blows can be delivered in the heat of passion, with no design or reflect." *Id.*

Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the Appellant's conduct in light of the surrounding circumstances. *State v. Wright,* No. 01C01-9503-CC-00093 (Tenn. Crim. at Nashville, Jan. 5, 1996). The State bears the burden of demonstrating some affirmative evidence to support a finding of premeditation. Brown, 836 S.W.2d at 530. By all accounts, the proof in the record reveals that the intent to assault was formed in passion, *i.e.,* the Appellant reacted to the victim striking Rollins immediately following a dispute over money for the purchase of beer. There was no proof in the record that the Appellant had formed a design or intent to kill the victim prior to his

assault. To the contrary, the assault proceeded to a conclusion without any intervening or dispassionate reflection. It was only after the victim's throat was slit that the assault ended. In *Brown*, our Supreme Court stated:

> [I]t has been held several times that the purpose need not be deliberated upon any particular length of time - it is enough if it precede the act, but in all such cases the purpose must be cooly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside . . . [I]f the purpose to kill is formed in passion . . . and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree.

*State v. Brown,* 836 S.W.2d at 539 (quoting *Rader v. State*, 73 Tenn. 610, 619-20 (1880)). Based upon these facts, we conclude that there is insufficient evidence to support the jury's findings of premeditation. Accordingly, the Appellant's conviction of first-degree murder cannot stand.

Again, once a homicide has been established, it is presumed to be second-degree murder. *State v. Brown*, 836 S.W.2d at 543. Tennessee Code Annotated § 39-13-210 (1991) defines second-degree murder as, "a knowing killing of another." Clearly, under the facts of this case, the Appellant acted "knowingly" with an awareness that his repeated and forceful blows to the head and body of the victim were reasonably certain to produce death. Tenn. Code Ann. § 39-11-106(20). We conclude that there is evidence to support "knowing" conduct, and, therefore, a second-degree murder conviction.

## CONCLUSION

For the reasons set forth above, we reverse the Appellant's conviction for first-degree murder and modify the judgment of the trial court to reflect his conviction of murder in the second-degree. Accordingly, we remand this case to the trial court for entry of a judgment of conviction in accordance with this opinion and for re-sentencing consistent with the principles of sentencing.

_____
L. TERRY LAFFERTY, SENIOR JUDGE