IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
MAY SESSION, 1996



FILED

Nov. 19, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | ) | |
| | ) | No. 02C01-9511-CR-00336 |
| Appellee | ) | |
| | ) | SHELBY COUNTY |
| vs. | ) | |
| | ) | Hon. L. T. Lafferty, Judge |
| **MALUNDA L. MYERS**, | ) | |
| | ) | (First Degree Murder) |
| Appellant | ) | |

For the Appellant:

James V. Ball
Attorney at Law
217 Exchange Avenue
Memphis, TN  38105

For the Appellee:

Charles W. Burson
Attorney General and Reporter

Ellen H. Pollack
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

John W. Pierotti
District Attorney General

Thomas Hoover and
Reginald R. Henderson
Asst. District Attorneys General
Third Floor, Criminal Justice Complex
201 Poplar Avenue
Memphis, TN  38103

OPINION FILED: _____

REVERSED AND REMANDED

**David G. Hayes**
Judge

## OPINION

The appellant, Malunda L. Myers, appeals from the verdict entered by a Shelby County jury finding him guilty of first degree murder and setting his punishment at life imprisonment. On appeal, the appellant raises the single issue of whether the evidence presented at trial was sufficient to support a conviction for first degree murder. Specifically, the appellant contends that the State failed to prove the requisite elements of premeditation and deliberation beyond a reasonable doubt.

After a careful review of the evidence presented at trial, we conclude that the proof is insufficient to support a conviction for first degree murder. For the reasons stated below, we modify the judgment of the trial court to reflect a conviction of second degree murder and remand for re-sentencing.

## I. Background

Joseph Curtis, a forty-five year old, self-employed landscaper, had arranged to visit and spend the night at the home of Barbara Parks and her husband, located at 2169 Harbert, Memphis. Curtis was single and resided with his parents. Mrs. Parks and Curtis had become friends through their mutual interest in flowers; Curtis sold flowers and Parks grew them.[1] On July 3, 1994, between 3:00 and 4:00 p.m., Curtis' mother and father took him to the Parks' residence. At trial, Barbara Parks confirmed Curtis' presence at her home until 10:00 p.m., when she developed difficulty breathing and Curtis advised Mr. Parks to take her to the hospital. Mr. and Mrs. Parks returned home between

---

[1] The record indicates that Joseph Curtis was also pursuing a nursing degree at the University of Memphis.

2:00 and 3:00 a.m.  Although she did not check, Mrs. Parks assumed that Curtis was asleep in one of the bedrooms.

Apparently, some time after 10:00 p.m., Curtis left the Parks' home and ultimately encountered a group of teenagers, a few blocks from the Parks' residence, "shooting dice" on the sidewalk.  In his statement to the police, the appellant, age seventeen at the time of the offense, related that he and two others, "Money" and "Terrio,"  were "shooting craps" outside Antonio Fason's house when Curtis approached them.  The appellant indicated that, at that time, his money was on the ground beside him.  Curtis was standing next to the appellant when he asked the group whether they had "any drugs."  The group responded that they did not have any drugs, and Curtis left.  Shortly after Curtis left the group, the appellant noticed that some of his money was missing.  He spotted Curtis "at the end of the corner of Philadelphia and Walker, purchasing some cocaine."  The appellant stated:

> That's when I walked up the street, coming toward him, and he had started walking off south direction, and then I told him to "come here," and he had stopped and I asked him, "where is the money, it came up missing."
>
> [Curtis] said, "I'm the plant man and I'll git (sic) it back to you."[2]
>
> [Curtis] told me. . . that he would have it tomorrow or whenever he sees me. That's when he took off running.  I caught up with him. He was calling for help. . . .
>
> But I said, I wanted it now, and he didn't have it, so that's when I hit him in the face with my fists.  Then he fell, after about three blows to the face (with my fists).  Then I had kicked him in his chest and in his face about three times.  I left the scene and came back and took his shirt and put it over his stomach and left, going home.

The appellant admitted that, after the beating, he removed his clothing and disposed of his jacket and shoes in "the back of some yard on Philadelphia."  He

---

[2]Testimony at trial indicated that Curtis provided landscaping services to residences in the area and was commonly referred to as "the plant man."

3

also indicated that he had never seen the victim prior to this incident.

Around 3:15 a.m., James Womble, a resident at 1010 South Cox, was awakened by loud arguing in front of his house.[3]  He looked outside and saw a fight going on across the street.  Womble stated that the victim was "on all fours," while the assailant, later revealed to be the appellant, was "hitting him around the head with his hands."  He added that the victim never attempted to strike a blow.  Rather, he just tried to "cover himself."[4]  Moreover, Womble heard the victim "pleading 'Please stop. Help. Please stop.'"  He testified:

> ...the black man was standing up over this white man, hitting him with his hands and kicking him with his feet.
>
> I opened my front door and went out. . . .  I went back in the house trying to find my telephone . . .  and my gun. . . .  I couldn't find either one.  Went back outside where they had moved further down the yard.  Found my phone, called 911. . . .

At this point, the victim was "doubled up" in a modified fetal position.  The appellant was kicking the victim This assault continued for about ninety seconds. At this point, Womble realized that he needed to find a weapon to stop the assailant's attack, although he stated that he never saw the appellant use or have possession of any type of weapon.  Inside his residence, he attempted to locate his gun without success.  When Womble emerged from his house a third time, the appellant was gone and the victim was in the street.  Womble testified that the victim was barely moving, "like slow motion."  He approached the victim and noticed that:

> he was . . . breathing very erratic and very loud, like gurgling.  And I believed he was . . . about to expire.  And I went over to him and tried to comfort . . . him as best as I could and held his hand until he died and the police showed up.

---

[3]Barbara Parks stated, in her testimony, that her residence, at 2169 Harbert, is within walking distance ("about a street over") of Cox, where the beating occurred.

[4]Barbara Parks testified that the victim was a very small man, weighing about 130 pounds and being around 5'4" tall.  However, the autopsy report indicated that Curtis weighed 173 pounds at the time of his death.  No indication of his height was noted in the report.  The pre-sentence report indicates that the appellant was approximately 5'6" tall, 150 pounds.

4

The following afternoon, the appellant was taken into custody, pursuant to the issuance of a petition charging him with second degree murder.[5] Following his arrest, the appellant waived his rights and volunteered a statement revealing his involvement in Curtis' death.

At trial, Dr. Jerry Francisco, medical examiner for Shelby County, concluded that Curtis' "death was due to multiple injuries to the head and body, basically beaten to death." He explained that these injuries were consistent with "a kicking, or stomping of the body" and with "a beating with the fists." Moreover, he stated that laboratory tests, routinely administered during an autopsy, revealed the presence of cocaine and cocaine metabolights in the victim's system. Dr. Francisco also noticed that the victim "had a variety of old scars elsewhere on his body" and that there was "periportal inflammation of the liver," which, according to him, suggested hepatitis. However, on cross-examination, Dr. Francisco was questioned about an autopsy report completed by Dr. Violet Hnilica. The findings of Dr. Hnilica's report indicated that "[the victim] had cocaine and it's products in the blood at toxic levels at the time of death and evidence of periportal inflammation in the liver that suggests repeated drug use."

Based upon this evidence, the court instructed the jury on the elements of first degree murder, second degree murder, and voluntary manslaughter. The jury found the appellant guilty of first degree murder.

## II. Sufficiency of the Evidence

The sole issue for our review is whether the evidence presented at trial is

---

[5]The record indicates that the initial petition was dismissed and that a second petition charging the appellant with first degree murder was issued.

sufficient to sustain a conviction for premeditated and deliberated first degree murder. Specifically, the appellant argues that there was no use of a deadly weapon; there was no conspiracy to kill people of a certain class; there was no evidence that the killing was particularly cruel; there was no declaration of an intent to kill the victim; and there was no evidence of preparations to conceal the crime before it occurred, all indicators of premeditation and deliberation. Moreover, he argues, the proof does establish that the victim and the appellant did not know each other, that the victim had stolen money from the appellant in order to purchase cocaine, that the victim was under the influence of cocaine at the time of the incident, and that the arresting officer believes that the facts of this investigation constitute second degree murder.

When there is a challenge to the verdict based on the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). We do not reweigh or reevaluate the evidence; these are issues resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, a guilty verdict accredits the testimony of witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant bears the burden of proving that the evidence was insufficient to support the jury verdict in his case. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder not committed in the perpetration of a crime requires the "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1994 Supp.). A death caused by the intentional act of

6

another is presumed to be second degree murder.  State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).  Thus, the State must prove premeditation and deliberation to elevate the offense to first degree murder.  Id.  Premeditation necessitates "the exercise of reflection and judgment,"  Tenn. Code Ann. § 39-13-201(b)(2) (1991), requiring "a previously formed design or intent to kill."  State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).  Deliberation, on the other hand, is defined as a "cool purpose . . . formed in the absence of passion."  Brown, 836 S.W.2d at 538 (citations and internal quotations omitted).  Deliberation also requires "some period of reflection, during which the mind is free from the influence of excitement."  Id.;  see also  Tenn. Code Ann. § 39-13-201(b)(2) (1989).  The State bears the burden of proving, beyond a reasonable doubt, the separate and distinct elements of premeditation and deliberation.  See Tenn. Code Ann. § 39-11-201(1) (1991).

The elements of premeditation and deliberation are questions for the jury and may be inferred from the circumstances surrounding the killing.  State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994).  Although there are no strict standards governing what constitutes proof of premeditation and deliberation, several relevant circumstances are helpful in the inquiry, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declarations by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime.  State v. Bland, No. 02C01-9412-CR-0028 (Tenn. Crim. App. at Jackson, Mar. 27, 1996), reh'g denied, (Tenn. Crim. App. May 1, 1996) (citing Brown, 836 S.W.2d at 541-42).  Additional factors from which the jury may infer premeditation and deliberation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing.  Id.  (citing State v. Bordis, No. 01C01-9305-CR-00157 (Tenn. Crim. App. at Nashville, Feb. 24, 1995), perm. to appeal

7

denied, (Tenn. July 10, 1995) (quoting 2 W. LaFave and A. Scott, Jr.,

Substantive Criminal Law Sec. 7.7 (1986))); Gentry, 881 S.W.2d at 4-5 (citation

omitted).  As noted earlier, the appellant argues that not one of these

circumstances exist in the present case.


Nonetheless, in order to prove premeditation and deliberation, the State,

in its brief, relies upon three factors: (1) the appellant's repeated blows to the

victim; (2) the victim pleading for help during the assault; and (3) the appellant's

concealment of his jacket and shoes after the incident.[6]  James Womble testified

that he witnessed the appellant's persistent beating of Joseph Curtis and Curtis'

pleas for help.  The appellant, himself, informed the police that he had disposed

of his clothing after the incident.  The State seeks to use this evidence as proof

of premeditation and deliberation.  In State v. Brown, our supreme court held that

"the fact that repeated blows were inflicted on the victim is not sufficient, by itself,

to establish first degree murder."  Brown, 836 S.W.2d at 542.  See also  State v.

Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995).  "Repeated blows can be

delivered in the heat of passion, with no design or reflection."  Id.  Additionally,

"the concealment of evidence after a crime may be associated with the

commission of any crime and the accompanying fear of punishment."  West, 844

S.W.2d at 148 (emphasis in original).  One who kills another in a passionate

rage may dispose of the weapon when reason returns just as readily as the cool,

dispassionate killer.  Id.


Because the trier of fact cannot speculate as to what was in the killer's

_____

[6]The State argued, at both the motion for judgment of acquittal and the motion for new trial, that, on the night of the incident, two separate encounters (the initial encounter near Philadelphia and Walker and the final encounter on Cox) between the appellant and the victim occurred.  The prosecutor contended that the requisite premeditation and deliberation were formed between these two encounters. However, the State does not adopt this theory on appeal. Moreover, we conclude, from the proof in the record, that there was but one continuing uninterrupted episode.  The evidence presented at trial indicates that the appellant did not learn of the victim's inability to return the stolen money until confronting the victim on Cox.  It was only at this time that the appellant began his assault on the victim, culminating in the victim's death.

mind, the existence of facts of premeditation and deliberation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). The State bears the burden of demonstrating some affirmative evidence to support a finding of both premeditation and deliberation. Brown, 836 S.W.2d at 530; see also Tenn. Code Ann. § 39-11-201(1). By all accounts, the proof, in the record, reveals that the intent to assault was formed in passion, upon the appellant's inability to recover his money from the victim (". . .I said, I wanted it now, and he didn't have it, so that's when I hit him in the face. . .." See supra, Section I, Background.). Moreover, there is no proof in the record that the appellant, at this time, had formed a design or intent to kill the victim. The assault proceeded to a conclusion without any intervening or dispassionate reflection. Only after the victim was rendered utterly helpless did the assault, which eventually resulted in the victim's death, end. In Brown, our supreme court stated:

> . . .[I]t has been held several times that the purpose need not be deliberated upon any particular length of time -- it is enough if it precede the act, but in all such cases the purpose must be coolly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside. . . . [I]f the purpose to kill is formed in passion  . . . , and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree.

Brown, 836 S.W.2d at 539 (quoting Rader v. State, 73 Tenn. 610, 619-20 (1880)). Based upon these facts, we conclude that there is insufficient evidence to support the jury's findings of premeditation or deliberation. Accordingly, the appellant's conviction of first degree murder cannot stand.

Again, once a homicide has been established, it is presumed to be second degree murder. Brown, 836 S.W.2d at 543. Tenn. Code Ann. § 39-13-210 (1991) defines second degree murder as, "a knowing killing of another." Clearly, under the facts of this case, the appellant acted "knowingly" with an

awareness that his repeated and forceful blows to the head and body of the victim were reasonably certain to produce death. <u>See</u> Tenn. Code Ann. § 39-11-106(20) (1991). We conclude that there is evidence to support "knowing" conduct, and, therefore, a second degree murder conviction.

## III. Conclusion

For the reasons set forth above, we reverse the appellant's conviction for first degree murder and modify the judgment of the trial court to reflect his conviction of murder in the second degree. Accordingly, we remand this cause to the trial court for entry of a judgment of conviction in accordance with this opinion and for re-sentencing consistent with the principles of sentencing.

_____
DAVID G. HAYES, Judge


CONCUR:


_____
PAUL G. SUMMERS, Judge


_____
PAUL R. SUMMERS, Special Judge

11