IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2001

## STATE OF TENNESSEE v. CLIFFORD COLEMAN, SR.

**Appeal from the Circuit Court for Giles County**
**No. 7367      Robert L. Jones, Judge**

---

**No. M2000-01916-CCA-R3-CD - Filed January 31, 2002**

---

The defendant, Clifford Coleman, Sr., was convicted of first degree murder and sentenced to life in prison.[1]  In this appeal of right, the defendant argues as follows:  (1) The evidence was insufficient to support his conviction for first degree murder; (2) the trial court erred by denying his requested jury instruction on deliberation; (3) the trial court erred by failing to instruct the jury on the lesser included offenses of reckless homicide and criminally negligent homicide; (4) the trial court erred by failing to grant a mistrial after dismissing a juror; and (5) the trial court erred by failing to grant a mistrial after a witness was allowed to testify in violation of the rule of sequestration.  The judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Shara A. Flacy, District Public Defender (at trial); John R. Wingo, Assistant Public Defender (at trial); and R. H. Stovall, Jr., Assistant Public Defender (on appeal), for the appellant, Clifford Coleman, Sr.

Paul G. Summers, Attorney General and Reporter; Laura McMullen Ford, Assistant Attorney General; Thomas M. Bottoms, District Attorney General; and Robert C. Sanders and Richard H. Dunavant, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In the early morning hours of April 27, 1995, the defendant arrived at the Giles County Sheriff's department and informed officers that he had injured his wife, Georgia, who was still at the couple's residence.  He admitted to officers that he had struck his wife with a metal pipe, which he

---

[1]Because the state did not seek the death penalty or life without parole, the defendant was automatically given a life sentence.  See Tenn. Code Ann. § 39-13-208(b)-(c) (Supp. 1994).

had in his vehicle. At the defendant's urging, officers retrieved the pipe and, upon inspection, determined that there was both blood and hair on the pipe.

When police arrived at the defendant's residence, Michael Holt, the victim's son, answered the door. Holt, who expressed surprise at seeing the police, first told officers that his mother was sleeping, then ran to her room to check on her. He found his mother lying on her bed, bleeding from her head and face. A pillow was over her head.

Later that morning, Investigator Mike Chapman asked the defendant, who was still at the Sheriff's Department, for permission to "look around" the residence. The defendant readily agreed. When he returned from the residence, Officer Chapman took a statement from the defendant. The following questions and answers were transcribed:

A. Well, she was laying there a fussing and cursing and carrying on at me and I [...]
Q. So you hit her?
A. Said a whole lot of nasty things about me and the[n] first one thing and another.
Q. She was laying there and you hit her, right? Where did you hit her first, Clifford?
A. Sir, I think on top of the head.

\*             \*             \*

Q. And you hit her with that pipe that you showed the other deputies this morning, right? You are nodding your head, yes. Were you so mad at the time that you hit her harder than maybe you would have normally done if you hadn't been mad? That sounds like a silly question, but you hit her pretty hard from what I saw. Is that right?
A. I probably did. I probably got a little mad because this thing has been building up between me and her for days now.
Q. After you hit her the first time, you just sort of kept on, didn't you?
A. I guess so. I mean, you know, I wish I could tell – I am telling you the truth. I don't know how many times I hit her.

The medical examiner, Dr. Charles Harlan, determined that the cause of death was "blunt trauma to the neck with a contribution from blunt trauma to the head." Dr. Harlan testified that he observed four lacerations on the victim's head, a maceration (crushing) of her left ear, and a crush injury to her throat.

After being indicted for first degree murder, the defendant filed notice under Tennessee Rule of Criminal Procedure 12 of his intent to use the defense of mental disease or defect. At the state's request, the defendant was taken to Middle Tennessee Mental Health Institute for evaluation.

At trial, Michael Holt testified that when he arrived home from work between 10:30 P.M. and 11:00 P.M. on the date of the murder, his mother was in bed, but not asleep, and the defendant was sitting in a chair at the foot of the bed. Holt testified that he was watching television when he heard a thud from the bedroom occupied by the defendant and the victim. According to Holt, the defendant, who showed only slight nervousness, claimed that the noise had come from the television.

-2-

Holt then asked for a cigarette. The defendant used his left hand to take a pack of cigarettes from his shirt pocket, shook the pack until a cigarette emerged, and handed the pack to Holt. Holt took a single cigarette. The defendant then handed Holt his lighter. During this conversation, the defendant held his right hand behind his back. The defendant then returned to his room. Shortly thereafter, the defendant then proceeded through the living room before walking out the door.

The defendant had informed officers that he had in his possession the metal pipe. He explained that he hid the pipe from Holt, whom the defendant described as having violent propensities, by wrapping it in his jacket. In his words, he "eased" past Holt and out of the house before driving to the sheriff's department.

Robert Robinson, who lived across the street, testified that the defendant told him approximately one week before the incident that "he was going to throw [the victim] in the alligator alley . . . ." Robinson also observed that the defendant and the victim argued extensively and stated that he had heard the victim threaten to kill the defendant. Peggy McWilliams, Robinson's girlfriend, remembered that sometime before the murder the defendant told her that she "needed to go buy . . . a black dress because [she] was going to be needing one." Both Robinson and Williams testified that they believed that the defendant was joking at the time he made these statements.

Deputy Paul King, who was working as a jailer on the date of the offense, testified that the defendant appeared to be confused and nervous when he arrived at the Sheriff's Department. Deputy King and Michael Thompson, an E-911 dispatcher and reserve deputy, retrieved the metal pipe from the defendant's car.

As part of the defense proof, Dr. Kirby Pate, a psychiatrist, testified that the defendant was "probably fearful of anger, and primarily someone who is fearful of asserting himself." It was his belief that the defendant suffered from vascular dementia, an insufficient blood supply to his brain, caused by years of poorly controlled hypertension. According to Dr. Pate, vascular dementia causes impulsive behavior and loss of both intelligence and the ability to think and remember. Dr. Pate testified that because of this mental defect, the defendant was unable to control his behavior and conform to the law, thereby qualifying him for the insanity defense.

Dr. Pamela Auble, a neuropsychologist, testified that the defendant's IQ was 74, borderline mentally retarded. It was her opinion that the defendant performed poorly on several neurological tests she administered. She stated that the personality tests she administered to the defendant revealed that "when [the defendant] is overwhelmed or placed in a situation which is very stressful for him that he does have the potential to just explode and to act very strongly for a short period of time."

In rebuttal, the state called as witnesses the psychologist, social worker, and psychiatrist who evaluated the defendant at Middle Tennessee Mental Health Institute. Dr. Susan Williams, a psychologist who participated in the defendant's evaluation, testified that the defendant had an IQ of 82 and that, while he had poor memory, poor memory was normal given his age and history of

drinking. Dr. Peter Clemm, a psychiatrist, testified that the defendant "was not suffering from a mental illness . . . at the time of the . . . crime."

I

Initially, the defendant challenges the sufficiency of the evidence. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Current law describes first degree murder as:

(a) First degree murder is;
(1) A premeditated and intentional killing of another;
(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy; or
(3) A killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a). At the time of the offense in 1995, however, first degree murder was defined as follows:

(a) First degree murder is:
(1) An intentional, premeditated and deliberate killing of another;
(2) A reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy;
(3) A reckless killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb; or
(4) A reckless killing of a child less than sixteen (16) years of age, if the child's death results from aggravated child abuse, as defined by § 39-15-402, committed by the defendant against the child.

Tenn. Code Ann. § 39-13-202(a) (Supp. 1994). Tennessee Code Annotated section 39-13-201 provided as follows:

> (a) Criminal homicide is the unlawful killing of another person which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide.
> (b) The following definitions apply in this part:
> (1) "Deliberate act" means one performed with a cool purpose; and
> (2) "Premeditated act" means one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait.

Tenn. Code Ann. § 39-13-201 (1991). Whether the evidence was sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the elements of intent, premeditation, and deliberation.

In State v. Brown, which interpreted the act in effect at the time of this offense, our supreme court held that the element of deliberation contemplates a lapse of time between the decision to kill and the killing:

> "[T]he deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait – the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time – it is enough if it precedes the act, but in all such cases the purpose must be coolly formed, and not in passion, or if formed in passion, it must be executed after the passion has had time to subside. . . . [I]f the purpose to kill is formed in passion . . . , and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree."

836 S.W.2d 530, 539 (Tenn. 1992) (quoting Rader v. State, 73 Tenn. 610, 619-20 (1880)). Our high court pointed to two respected authorities to emphasize the important distinction between the elements of premeditation and deliberation:

> 'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and 'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the

thinking, i.e., the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision.

Id. at 540-41 (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)) (emphasis omitted).

Perhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection, and of 'premeditation' that it requires that the one with the cool mind did in fact reflect, at least for a short period of time before his act of killing.
It is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' and convictions for first-degree murder have frequently been affirmed where such short periods of time were involved. The better view, however, is that to 'speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, . . . destroys the statutory distinction between first and second-degree murder,' . . . .

Id. at 541 (quoting 2 W. LaFave and A. Scott, Substantive Criminal Law § 7.7 (1986)) (emphasis omitted).

This court has held that the elements of deliberation and premeditation are questions for the jury and may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

Here the defendant contends that the evidence is insufficient to support his conviction because the state failed to present any evidence of deliberation. The defendant concedes that, in the light most favorable to the state, the jury could have inferred premeditation from the statements made to his neighbors before the offense.

The proof offered at trial established that the defendant and the victim were engaged in an argument when the defendant picked up a metal pipe and struck her five to six times. At trial, the state relied heavily on two facts to support a finding of deliberation: (1) The defendant made attempts to conceal the crime after it occurred; and (2) the defendant struck the victim repeatedly. Significantly, the state does not argue on appeal that repeated blows, under the law in 1995, qualified as evidence of deliberation. In Brown, our supreme court held that "[r]epeated blows can be delivered in the heat of passion, with no design or reflection." Brown, 836 S.W.2d at 542. The state does, however, contend that the defendant's attempts to conceal the crime by falsely claiming that the noise from the assault was from the television and by claiming to the police that the victim had threatened him with a red-handled knife during an earlier argument qualify as evidence of deliberation. Our case law, however, establishes that concealment of evidence after a crime is not probative of intent held prior to the crime. See, e.g., State v. Ricky A. Burks, No. M2000-00345-CCA-R3-CD (Tenn. Crim. App., at Nashville, May 25, 2001) (citing State v. West, 844 S.W.2d 144,

-6-

148 (Tenn. 1992)). There was, however, some evidence of cool purpose, which was a required element of the crime at the time of the offense. After the murder, the defendant calmly explained to his stepson, Michael Holt, that the noise incident to the assault actually came from the television. Despite the fact that he was hiding the murder weapon behind his back, his manual dexterity was unaffected. With his left hand, he handed Holt a cigarette and a lighter and returned to his room without displaying any particular distress. Holt, who had a propensity for violence and was so angry that he had to be restrained and maced by police after being informed of his mother's death, detected only a possibility of nervousness on the part of the defendant when he asked about the noise. See State v. Bland, 958 S.W.2d at 660 and State v. West, 844 S.W.2d at 148 (holding that calmness immediately after a killing is evidence of deliberation). Further, one week before the murder the defendant expressed to others poorly veiled threats to kill the victim, saying that he intended to throw the victim in "alligator alley" and suggesting that a "black dress" would soon be necessary. In addition to the element of premeditation, those statements might also be interpreted as not so humorous statements of purpose. His statement to police that "things had been building up" on the day prior to the killing also implies some degree of deliberation. Taken in the light most favorable to the state, there was by a thin margin sufficient evidence to support a finding of cool purpose.

## II

At trial, the defense submitted several requested jury instructions, most of which followed the language of the pattern jury instructions. The requested instruction on first degree murder, however, differed slightly from the pattern instruction in that it contained an extra paragraph on the element of deliberation. The trial court denied this request and chose, instead, to provide the pattern instruction. Additionally, the defense requested that the trial court instruct the jury on the offenses of reckless homicide and criminally negligent homicide. The trial court also denied these instructions and chose to only instruct the jury on first degree murder, second degree murder, and voluntary manslaughter.

Initially, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Erroneous jury instructions require a reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586 (Tenn. Crim. App. 1992).

The defendant requested that the trial court add the following paragraph to Tennessee Pattern Jury Instruction Crim. 7.01(a):

Deliberation requires some period of reflection, during which the mind is free from the influence of excitement or passion. Premeditation does not require a specific amount of time to pass between the formation of the idea and the act. However, the intent necessary to commit first degree murder may not be formed in an instant because of the additional requirement of deliberation. Furthermore, repeated blows alone are not enough to prove first degree murder.

While the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. See, e.g., State v. Tyson, 603 S.W.2d 748 (Tenn. Crim. App. 1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. See State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980). In our view, Tennessee Pattern Jury Instruction Crim. 7.01 correctly stated the law as it existed in 1995. Moreover, this court has specifically approved of its content, ruling that the pattern instruction contained an adequate explanation of the elements the state must prove beyond a reasonable doubt before a defendant may be convicted of first degree murder. State v. Makoka, 885 S.W.2d 366, 372 (Tenn. Crim. App. 1994). Thus, the trial court did not err in denying the special request on deliberation.

As indicated, the defendant also asked that the trial court instruct the jury on the lesser included offenses of reckless homicide and criminally negligent homicide. Citing State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998), the state concedes that the trial court's refusal to instruct on the lesser included offenses was error, but submits that it was harmless because the jury convicted the defendant of the highest offense charged, first degree murder.

Although this case was tried in 1997, the issue of the trial court's failure to charge lesser included offenses is controlled by State v. Burns, 6 S.W.3d 453 (Tenn. 1999), and its progeny. The decision in Burns has been consistently applied to cases within the appellate pipeline at the time of filing. See, e.g., State v. Billy Joe Stokes, 24 S.W.3d 303 (Tenn. 2000); State v. Jumbo Kuri, No. M1999-00638 CCA-R3-CD (Tenn. Crim. App., at Nashville, May 25, 2000); State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144 (Tenn. Crim. App., at Knoxville, Mar. 22, 2000); State v. Khanh V. Le, No. W1998-00637-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 9, 2000); State v. Gary Lee Miller, No. M1998-00788-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar. 6, 2000); State v. Brandon Patrick, No. 03C01-9905-CC-00201 (Tenn. Crim. App, at Knoxville, Jan. 26, 2000); State v. David Michael Gamble, No. 03C01-9812-CR-00442 (Tenn. Crim. App., at Knoxville, Jan. 21, 2000). A case is within the appellate pipeline when it is pending at the time of the decision and fairly raises the issue. See State v. McClintock, 732 S.W.2d 268, 274 (Tenn. 1987); Adams v. State, 547 S.W.2d 553, 555-57 (Tenn. 1977). Because the defendant's motion for new trial presented this issue and the question was pending in the trial court when Burns was decided,[2] it qualifies as falling within the appellate pipeline.

---

[2] The defendant's motion for new trial, which was timely filed on April 9, 1997, was heard on June 14, 2000.

In Burns, our supreme court revised the standards for the determination of lesser included offenses. In a companion case, State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), our high court confirmed that it had overruled that portion of State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), in which it had established a distinction between lesser grades or classes of offenses and lesser included offenses. In Burns, the court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

An offense is a lesser included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of
(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or
(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67. Using this analysis, reckless homicide and criminally negligent homicide are lesser included offenses of first degree murder. See, e.g., State v. Letivias Price, No. M1998-00005-CCA-R3-CD (Tenn. Crim. App., at Nashville, Aug. 10, 1998).

Having determined that reckless homicide and criminally negligent homicide are lesser included offenses of first degree murder, our next inquiry is whether the evidence warranted an instruction on those offenses. Burns, 6 S.W.3d at 467. The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser included offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In Burns, our supreme court adopted a two-step process for determining whether the evidence justifies a jury instruction on a lesser included offense:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the

credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469.

In 1995, reckless homicide, a class D felony, was defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215 (Supp. 1994). Criminally negligent homicide, a class E felony, occurred when criminally negligent conduct resulted in the death of another. Tenn. Code Ann. § 39-13-212 (1991).

Here, the defendant relied on insanity as a defense and introduced evidence of his mental state at the time of the offense. While the jury rejected this theory as an absolute defense, it could have considered any diminished capacity in determining whether the defendant was able to form the required mens rea for first or second degree murder. Our supreme court held in State v. Abrams that "evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense." 935 S.W.2d 399, 402 (Tenn. 1996). Additionally, our high court has opined that

> [i]n modern application, diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed.

State v. Hall, 958 S.W.2d 679, 688-89 (Tenn. 1997). This court has held that testimony of diminished capacity may justify "an acquittal of the indicted offense and a conviction for a lesser included offense." State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999). Reckless homicide and criminally negligent homicide have less culpable mental states than both second degree murder and voluntary manslaughter, which have the same culpable mental state.[3]

Examining all of the proof in the light most favorable to the existence of the lesser included offenses, as required by Burns, it is our view that the failure to instruct on either reckless homicide or criminally negligent homicide qualifies as harmless error, having had no effect on the results of the trial.

In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court, appearing to reject a line of cases which had concluded that the right to instructions on lesser offenses was

---

[3]At the time of the offense, second degree murder required the state to prove that a killing was "knowing." Tenn. Code Ann. § 39-13-210(a)(1) (1991). Voluntary manslaughter was defined as an "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1991).

-10-

founded in the right to trial by jury under the Tennessee Constitution, ruled that the entitlement was based upon a statutory requirement. See Tenn. Code Ann. § 40-18-110(a). Our high court directed that any error in the omission of a lesser included offense would be subject to the following harmless error analysis:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Williams, 977 S.W.2d at 105.

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), the defendant, who was charged with premeditated first degree murder, was willing to gamble on an "all or nothing" verdict by asking the trial judge not to charge the lesser included offense of second degree murder; the trial judge refused and the defendant was convicted on that lesser crime. While our supreme court affirmed that second degree murder conviction, its opinion emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction of the lesser offense." Id. at 593. Our supreme court also acknowledged that the "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment [and to] facilitate the overall truth-seeking function of the process." Id. If the failure to charge a lesser included offense was an error of constitutional dimension, as Bolden implied, the proper question would have been whether the error was harmless beyond a reasonable doubt. In State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000), however, our supreme court followed the rationale in Williams and held that reversal was required only "if the error affirmatively affected the result of trial, or if the error more probably than not affected the judgment to the defendant's prejudice." The high court concluded that the trial court's failure to instruct misdemeanor assault as a lesser included offense of the primary charge, aggravated sexual battery, was harmless error under Tennessee Rule of Criminal Procedure 52(a).

In State v. Ely, our supreme court clarified the holding in Williams and confirmed that the failure to charge a lesser included offense qualifies as an error of constitutional proportions:

> That the right of trial by jury is of constitutional dimension is evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider all offenses supported by the evidence.

48 S.W.3d 710, 727 (Tenn. 2001) (emphasis in original); see also State v. Bowles, 52 S.W.3d 69 (Tenn. 2001). Our high court directed that in reviewing error arising from a failure to charge one or more lesser included offenses, "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Ely, 48 S.W.3d at 727.

In applying the holdings of Williams, Ely, and Bowles, some panels of this court have ruled that the failure to charge lesser included offenses is necessarily harmless beyond a reasonable doubt when the defendant is convicted of the highest offense charged and the jury is instructed on the immediate lesser offense but not other lesser offenses. See, e.g., State v. Haison Fields, No. M2000-02144-CCA-R3-CD (Tenn. Crim. App., at Nashville, October 8, 2001) (finding error where the trial judge failed to charge on a number of lesser included offenses but concluding that because the jury found attempted first degree murder in lieu of attempted second degree murder, the error was harmless beyond a reasonable doubt); State v. Jon Robert Goodale, No. M2000-02140-CCA-R3-CD (Tenn. Crim App., at Nashville, Sept. 14, 2001) (holding that because the defendant was convicted of aggravated robbery, the error was harmless beyond a reasonable doubt when the trial court instructed the jury on facilitation of aggravated robbery, robbery, and facilitation of robbery, but not accessory after the fact); State v. Ernest Edward Wilson, No. M2000-01997-CCA-R3-CD (Tenn. Crim. App., at Nashville, Oct. 17, 2001) (holding that where the defendant, who was charged with first degree murder and claimed self-defense, was convicted of second degree murder and the trial court instructed on voluntary manslaughter, the second degree murder conviction necessarily rendered the failure to instruct on reckless homicide and criminally negligent homicide harmless beyond a reasonable doubt). Others agree that the failure to instruct the jury on lesser included offenses is harmless beyond a reasonable doubt in situations like that presented in Williams, but go further by stating that the Williams situation is the only scenario under which the failure to instruct on lesser included offenses may be found harmless beyond a reasonable doubt. See State v. Rickie Boyd, No. W2000-01010-CCA-R3-CD, slip op. at 4 n.7 (Tenn. Crim. App., at Jackson, Sept. 10, 2001) (observing that "[i]t remains unclear whether situations other than the Williams scenario may provide a basis for finding an erroneous failure to instruct on lesser offenses harmless beyond a reasonable doubt"); State v. Linnell Richmond and Shervon Johnson, No. M2000-01545-CCA-R3-CD (Tenn. Crim. App., at Nashville, Oct. 15, 2001) (stating that "the only time a failure to instruct on lesser-included offenses can be considered harmless beyond a reasonable doubt is in the situation presented by the Williams case, i.e., where the jury by rejecting a verdict of guilt on an intermediate lesser-included offense for which they were instructed, in favor of a verdict on the more serious offense, 'necessarily' rejects all other lesser-included offenses") (Smith, J., concurring and dissenting).

The determination of whether such failure is harmless beyond a reasonable doubt may be, as these cases suggest, a mechanically applied analysis, but a fact-specific test is the more traditional analysis, requiring a contextual review of the evidence in the record. See State v. Darrell Presnell, No. E2000-02544-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Aug. 10, 2001); State v. George Redd, No. W2000-01620-CCA-R3-CD (Tenn. Crim. App., at Jackson, Aug. 9, 2001) (stating that "we must be able to conclude beyond a reasonable doubt that the jury in this case would not have found the Defendant guilty of one of the lesser included offenses, rather than the principal offense, if the jury had been given the opportunity to consider the lesser included offenses"); State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Aug. 2, 2001). A concurring opinion authored by Chief Justice Rehnquist in Sullivan v. Louisiana describes the duty of the appellate court in circumstances where there is constitutional error:

[T]he reviewing court is usually left only with the record developed at trial to determine whether it is possible to say beyond a reasonable doubt that the error did not contribute to the jury's verdict. . . . [A]ny time an appellate court conducts harmless-error review it necessarily engages in some speculation as to the jury's decision making process; for in the end no judge can know for certain what factors led to the jury's verdict.

508 U.S. 275, 283 (1993) (Rehnquist, J., concurring).

In Fahey v. Connecticut, 375 U.S. 85 (1963), our highest court observed that the real question when there is a constitutional violation is whether there is "a reasonable possibility" that error might have contributed to the conviction. In Chapman v. California, our Supreme Court approved of that language and further concluded that when constitutional error has occurred, appellate courts have the obligation "to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967).

Here, the jury convicted the defendant of the highest offense with which he was charged, first degree murder. Additionally, the defendant presented evidence of his diminished capacity, which was properly instructed,[4] and upon which the jury could have found that the defendant was not guilty of first degree murder, nor even second degree murder, but of voluntary manslaughter or perhaps an even lesser included offense. Because the evidence, in this instance, was sufficient to support the verdict of first degree murder and the jury refused to consider alternatives of second degree murder and voluntary manslaughter, it is most unlikely that even lesser offenses would have been considered. While the failure to instruct on reckless homicide and criminally negligent homicide was also error, it is our view that from the facts presented, that the error was harmless beyond a reasonable doubt. The jury rejected insanity as a defense and was given an opportunity to consider the impact of the diminished capacity on other homicide possibilities. The proof established that the defendant, mindful of his dissatisfaction with the victim and angered at her behavior, stewed for days before following through on his threats by beating her to death with a metal pipe. Under these circumstances, it is difficult to imagine how the failure to instruct on reckless or negligent homicide had any possible effect on the verdict.

III

The defendant next contends that the trial court erred by dismissing the only African-American juror, Beverly Marie Gardner, on the second day of trial. As styled, the argument appears to challenge Ms. Gardner's dismissal under Batson v. Kentucky, 476 U.S. 79 (1986); however, the

_____

[4]With regard to diminished capacity, the trial court instructed the jury as follows:

In this case you have heard evidence that the defendant might have suffered from a mental disease, defect, or condition, which could have affected his capacity to form the culpable mental state required to commit a crime. If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine, beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense he is guilty.

defendant's brief does not include any argument that Ms. Gardner's dismissal was racially motivated. Instead, the defendant argues that the trial court lacked sufficient cause to dismiss her.

The trial began on March 12, 1996, and on March 13, the second day of trial, the trial court dismissed juror Beverly Gardner. Ms. Gardner had first expressed some reluctance to sit on the jury during voir dire. She stated that she knew the children of both the victim and the defendant, and expressed concern about exercising her responsibilities as a juror. After agreeing that she could put these problems aside and follow the instructions of the court, Ms. Gardner was seated on the jury. On the second day of trial, Ms. Gardner informed the clerk of her continuing discomfort, saying that she did not want to be there. Later, during questioning by the trial court and counsel, Ms. Gardner wiped away tears as she described her anxiety. The trial court excused Ms. Gardner on this basis.

Tennessee Rule of Criminal Procedure 24(e)(1) allows the trial court to replace a sitting juror who "become[s] or [is] found to be unable or disqualified to perform [his or her] duties" with an alternate juror. A determination of the qualifications of a juror rests within the discretion of the trial court and will not be overturned absent a showing of an abuse of that discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989); see also State v. Millbrooks, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991). The defendant bears the burden of demonstrating that the trial court abused its discretion and that he was prejudiced by the substitution. State v. Max, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986). While the defendant has a right to a fair trial at the hands of an impartial jury, he has no right to have his case decided by any particular jurors. See State v. Smith, 857 S.W.2d 1, 20 (Tenn. 1993).

Here, the defendant has failed to articulate what prejudice he suffered as a result of the court's excusal of Ms. Gardner. Because the defendant has failed to establish prejudice, the issue is without merit.

IV

Finally, the defendant argues that the trial court erred by refusing to grant a mistrial after allowing Rhonda Holt, the victim's daughter, to testify in violation of Rule 615 of the Tennessee Rules of Evidence. The state called Ms. Holt as a rebuttal witness. The defense objected to her testimony because she had been present in the courtroom throughout the trial. The state contended that it did not become aware of Ms. Holt's testimony, and the need for it, until after Dr. Auble testified. According to Ms. Holt, she had the following conversation with the defendant in 1994:

> '[P]eople think I'm crazy.' He said, 'I used to drive around through town with no shirt on, with a tie, with my hat turned around backwards and I had to take these tests where they would make you put the shapes in the right spots and I would put shapes in the wrong place, but I'm not crazy.'

The trial court ruled that Ms. Holt's testimony was critical to the primary issue and thus admissible despite the violation of the rule of sequestration.

Rule 615 of the Tennessee Rules of Evidence provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. State v. Harris, 893 S.W.2d 54, 68 (Tenn. 1992). Rule 615 is mandatory and may be invoked at any time. State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Many sanctions exist for violations of the rule. In the most egregious case, the trial court may declare a mistrial. Id. Even when the trial court does not declare a mistrial, the witness may be cross-examined regarding the violation, and the jury may be instructed to consider the violation in assessing the witness' credibility. Id. "The generally accepted procedure in Tennessee . . . is for the court to hold a jury-out hearing to determine both the facts of the violation and whether a party was prejudiced by the violation." Neil P. Cohen, et. al., Tennessee Law of Evidence § 615 [11] [e] (4th ed. 2000). When a sequestration rule violation is raised on appeal, this court considers the seriousness of the violation and the prejudice, if any, suffered by the defendant. Harris, 839 S.W.2d at 68-69.

Here, the trial court ruled that Ms. Holt's testimony was of critical necessity and used its discretionary power to allow her to testify. Because the state called two expert witnesses to testify that the defendant was sane, the defendant argues that Ms. Holt's testimony was not necessary to the state.

The record demonstrates that both the prosecution and Ms. Holt were aware that the defendant intended to rely on insanity as a defense. Weeks in advance of trial, the defense provided the state with a copy of the psychologist's report. Experts for the state, who had evaluated the defendant, stood ready to testify to his sanity and any possible malingering. While the state was not aware of Ms. Holt's knowledge regarding the defendant's sanity, this is not typically the kind of surprise contemplated by the rule. Cf. State v. David Scarbrough, No. E1998-00931-CCA-R3-CD (Tenn. Crim. App., at Knoxville, July 11, 2001) (where the defendant was able to show surprise when an alibi witness changed her testimony on cross-examination). In our view, the rule is

-15-

designed to preclude testimony like that offered here.  See State v. Wingard, 891 S.W.2d 628 (Tenn. Crim. App. 1994) (permitting a witness to testify in violation of the rule was harmless error where the witness was not likely to be influenced by prior witnesses); see also State v. Angela H. Black, No. M2000–2368-CCA-R3-CD (Tenn. Crim. App., at Nashville, Oct. 12, 2001) (error was harmless where the rebuttal witness's testimony was not directly related to that of a prior witness).  Ms. Holt, a close relative of the victim, was in the courtroom throughout the entire trial.  It was only after Dr. Auble provided detailed testimony about the defendant's performance on several tests that she choose to reveal to the prosecution her conversation with the defendant.  In our view, the trial court should not have permitted Ms. Holt to testify.

Having determined that the trial court erred by allowing Ms. Holt to testify, our next inquiry is what, if any, prejudice the defendant suffered as a result of her testimony.  Here, the trial court allowed defense counsel to cross-examine Ms. Holt regarding both the rule violation and her timely recollection of her conversation with the defendant.  Moreover, the trial court instructed the jury as follows:

> I've concluded in my discretion, after reading some cases and hearing arguments from the lawyers on both sides, that I will permit this witness to testify, but with your understanding that she was in here and heard the testimony of the neuropsychologist this morning.  And the lawyers will be examining and cross examining this witness on those issues and you may take into consideration the fact that she heard that earlier testimony this morning in weighing the credibility of this witness and deciding whether to give any weight to her testimony in your later verdict.

In our view, the trial court's instruction coupled with defense counsel's thorough cross-examination served to minimize the prejudice caused by her testimony.  Thus, the issue is without merit.

## CONCLUSION

The evidence was sufficient to support the defendant's conviction for first degree murder. Although the trial court failed to instruct on the lesser included offenses of reckless homicide and criminally negligent homicide, this court determines beyond a reasonable doubt that the errors had no effect on the verdict.  The judgment must be affirmed.

_____
GARY R. WADE, PRESIDING JUDGE