STATE of Tennessee, Appellee,

v.

Allan BROOKS, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 9, 1993.

Permission to Appeal Denied by the Supreme Court May 2, 1994.

Virginia Lee Story, Franklin, for appellant.

Charles W. Burson, Atty. Gen., and Merrilyn Feirman, Asst. Atty. Gen., Victor S. Johnson, III, Dist. Atty. Gen., and Roger D. Moore, Renee Erb, Asst. Dist. Attys. Gen., Nashville, for appellee.

*OPINION*

BIRCH, Judge.

The defendant, Allan Brooks, appeals the judgment of the trial court entered upon a jury verdict that found him guilty of first-degree murder in the death of Amy Peyton. The trial court sentenced Brooks to imprisonment for life in the Department of Correction; this life sentence is to be served consecutively to a four-year sentence imposed pursuant to a conviction for sale of a controlled substance.

On appeal, the defendant contends that the evidence presented at trial was insufficient to support the jury verdict and raises the following issues for our review:

1. Whether the defendant was denied his right to a preliminary hearing;
2. Whether the defendant was denied a speedy trial;
3. Whether the state failed to provide discovery to the defendant, thereby denying him a fair trial;
4. Whether the trial court erred in allowing certain testimony relating to his character and prior acts;
5. Whether the trial court erred in admitting certain photographs of the victim;
6. Whether the trial court erred in allowing the state to use an enlarged exhibit during closing argument;
7. Whether the trial court erred in refusing to charge the jury on the law of "imperfect self-defense"; and
8. Whether the trial court erred in sentencing the defendant.

After careful consideration, we conclude that a new trial is necessary because the jury instructions used in this case do not comport with the dictates of *State v. Brown*, 836 S.W.2d 530 (Tenn.1992). Due to our disposition of this issue, there is no need to address evidentiary sufficiency, contentions arising from evidentiary rulings, the other jury instruction question, or sentencing.

I

The record establishes that the long-standing relationship between Peyton and the defendant can best be characterized as turbu-

lent. On August 19, 1989, Peyton went to a bar in the company of friends. While there, she met briefly with the defendant. They argued, and the defendant left shortly thereafter. Peyton returned to her apartment at approximately 2:30 a.m.

Cody Albin resided in the apartment directly above Peyton's. Albin testified that she was awakened at 5:02 a.m. on the morning of August 20, 1989, by the slamming of a door. Immediately, she heard a man and a woman arguing in the apartment below. Realizing she would get no more sleep, Albin arose and began to prepare for work. After about five minutes of this commotion, Albin testified that she heard "bloodcurdling" screams and the sounds of a struggle. Albin called 911. She stated that the screaming continued for about five minutes—then there was complete silence that lasted for approximately one to two minutes. Next, Albin heard a single gunshot.

Upon their arrival at the scene, investigating officers found Peyton's body. She had been severely beaten and shot in the face. They also found a note, apparently written by Brooks, stating that he was going to kill Peyton and then kill himself.

Les Rawding, a friend of Brooks, testified that he received a telephone call from Brooks at approximately 7:45 a.m. on August 20. Brooks told Rawding that he had killed Peyton and had left a note admitting responsibility.

Brooks was subsequently arrested on unrelated charges in Florida. Upon arrest, the gun he had used to kill Peyton was confiscated from him.

According to Mona Gretel Case Harlan, M.D., the victim sustained a broken nose, gashes to the head and ear, numerous blows to the mouth, and a severe blow to the head that probably rendered her helpless. From the position of the body, Harlan opined that Peyton had been shot as she lay upon the couch. Finally, the presence of an unusual pattern of stippling[1] on the face and arm prompted Harlan to conclude that the vic-

tim's arm had been raised to cover her face in a defensive posture when she was shot.

Bradley Diner, M.D., and Leonard Morgan, Jr., Ph.D., testified for the state. They both concluded that Brooks was sane at the time of the crime.

Brooks testified in his own defense and stated that he went to Peyton's apartment that morning in order to retrieve items of his property she had taken from his house without permission. He admitted that he kicked in the door to Peyton's apartment and went inside. They argued, and Peyton threatened him with a gun. He wrested the gun from her. A brief moment of calm ensued, after which Peyton attempted to retrieve the gun. They struggled anew. Brooks testified that they each were holding the weapon when the fatal shot was fired. He stated that he had never intended to kill Peyton and that the shooting was in self-defense and accidental.

Finally, Kenneth Anchor, Ph.D., a psychologist, testified that Brooks had a borderline personality disorder with paranoid features of chronic substance abuse. Anchor concluded that Brooks was legally insane at the time of the crime.

Upon the foregoing proof, the jury convicted Brooks of premeditated murder; however, they acquitted him of felony murder and first-degree burglary.

## II

■ In order to convict a defendant for premeditated murder, the jury must find that the defendant formed the intent to kill prior to the killing, i.e., premeditation, and that the defendant killed with coolness and reflection, i.e., deliberation. As stated in *Brown:*

> the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, *in the absence of passion, to take the life of the person slain.*

*Brown,* 836 S.W.2d at 539 (Tenn.1992) (quoting *Rader v. State,* 73 Tenn. 610, 619–20

---

1. When a gun discharges close to a body (within two feet), the firing residue produces tiny burns on the skin which resemble brown polka dots called stippling.

(1880)) (emphasis added). The Court in *Brown* continued:

> The obvious point to be drawn from this discussion is that even if intent (or 'purpose to kill') and premeditation ('design') may be formed in an instant, deliberation requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'

*Id.,* at 540 (quoting *Clarke v. State,* 218 Tenn. 259, 402 S.W.2d 863, 868 (1966)). Finally, the *Brown* court held that:

> [the] intent to kill, if formed during a deadly struggle, would support only a conviction for second-degree murder, *unless* the state could show that premeditation and deliberation had preceded the struggle.

*Id.,* at 542 (emphasis in original).

> The jury was instructed as follows:

> Premeditation means that the intent to kill must have been formed prior to the act itself. *Such intent or design to kill may be conceived and deliberately formed in an instant. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval. The mental state of the accused at the time he allegedly instigated the act which resulted in the alleged death of the deceased must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.* Passion does not always reduce the crime below Murder in the First Degree, since a person may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. *If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a passion or an excited state when the design was carried into effect.* (emphasis added).

These instructions do not treat premeditation and deliberation as distinct and separate elements of premeditated murder. According to *Brown,* such differentiation is crucial.

Given that the jury instructions failed to differentiate between premeditation and deliberation as required by *Brown,* these instructions were erroneous. Because the evidence from the record could either support or fail to support a finding of deliberation, we cannot conclude that the erroneous jury instructions were harmless. Rule 36(b), Tenn.R.App.P. Thus, since the defendant was not afforded a correct explanation of the law, we remand this cause for a new trial.

### III

Brooks contends that he was denied his right to a preliminary hearing within the ten days as mandated by Rule 5(d) of the Tennessee Rules of Criminal Procedure, and therefore, the indictment against him should be dismissed.

The arrest warrant states that the defendant was arrested on September 7, 1989. According to the warrant, he was in court on September 9, 11, 13, 14, 18, and 26. According to the defendant, the preliminary hearing was held on October 19, 1989, although there is no other evidence in the record to support his contention.

A preliminary hearing is not constitutionally mandated. *Vaughn v. State,* 557 S.W.2d 64 (Tenn.1977).

Rule 5(d), Tenn.R.Crim.P., requires that a preliminary hearing be scheduled in ten days if the defendant remains in custody and within thirty days if the defendant is released. Subsection (e) of Rule 5 states:

> Any defendant arrested prior to indictment or presentment ... shall be entitled to a preliminary hearing upon his request therefor, whether the grand jury of the county be in session or not. If the defendant is indicted during the period of time in which his preliminary hearing is being continued, or at any time before the accused has been afforded a preliminary hearing on a warrant, whether at his own request or that of the prosecutor, he may dismiss the indictment upon motion to the court. Provided, however, that no such Motion to Dismiss shall be granted after

the expiration of thirty days from the date of the defendant's arrest.

Therefore, under subsection (e), the defendant's remedy for a denial of a preliminary hearing is simply to request such a hearing and to move the court within thirty days of the arrest to dismiss any indictment returned while the hearing is pending. Clearly, the remedy only ensures that the state may not avoid the preliminary hearing by delaying in order to obtain an indictment in the interim. This remedy does not include dismissal of the original warrant upon which the defendant was arrested. Subsection (e) simply ensures that a defendant who requests a preliminary hearing may have one—whether it occurs within the prescribed time frame of the rule or not.

The defendant was not denied a preliminary hearing; it was simply delayed. The indictment was returned against the defendant in January, two months after his preliminary hearing. There is no indication from the record that the defendant objected to the delay of the hearing during his six court appearances after his arrest but before his hearing. The defendant filed no motion to dismiss within the thirty days as mandated by the rule. Finally, there is no indication of bad faith on the part of the state which would allow any extension of the thirty day rule. *See Moore v. State,* 578 S.W.2d 78 (Tenn. 1979). This issue is overruled.

### IV

■ Next, the defendant contends he was unconstitutionally denied his right to a speedy trial. The trial was originally set for August 6, 1990, but it was continued due to an overcrowded court docket. The defendant filed a demand for a speedy trial on August 31, 1990; the trial began on January 28, 1991.

■ The defendant relies upon T.C.A. § 40–18–103(a), which provides that a first-degree murder trial shall occur within 150 days of arraignment. However, the state's admitted failure to comply with this provision does not require the release of the defendant or the dismissal of the charges. T.C.A. § 40–18–103(e).

■ The defendant also relies upon *State v. Bishop,* 493 S.W.2d 81 (Tenn.1973). In *Bishop,* the Tennessee Supreme Court adopted a four-factor test to determine whether a defendant has been denied his right to a speedy trial. The factors to be considered are: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right, and (4) the prejudice to the defendant occasioned by the delay. *Bishop,* 493 S.W.2d at 81.

The length of delay in this case, one year from indictment to trial, is not unusual especially when one considers the seriousness of the offense. *See State v. Thomas,* 818 S.W.2d 350 (Tenn.Crim.App.1991). According to the defendant, the case was continued due to an overcrowded court docket, a legitimate reason according to Tennessee courts. *See State v. Turnbill,* 640 S.W.2d 40 (Tenn. Crim.App.1982); *Tillery v. State,* 565 S.W.2d 509 (Tenn.Crim.App.1978). The defendant filed his demand for a speedy trial on August 31, 1990.

We now consider the final and perhaps the most important component in the analysis: that is, whether Brooks was prejudiced. The defendant argues that the delay resulted in the loss of certain anticipated testimony from a witness who was killed just prior to the January 1991 trial. To demonstrate prejudice, Brooks offered the affidavit of the witness' widow. This affidavit states that the deceased witness would have testified that he observed Peyton abuse Brooks verbally and physically on several occasions.

After careful review of the affidavit and consideration of the testimony of other witnesses called by the defendant, we are convinced that any prejudice occasioned by the delay was minimal, if indeed there was any at all.

We have considered the four factors, and we conclude that the defendant was not unconstitutionally denied a speedy trial. This issue is without merit.

We remand this cause for a new trial for the reasons initially stated.

SCOTT, P.J., and WADE, J., concur.