IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## STATE OF TENNESSEE v. MIKE EDWARDS

**Direct Appeal from the Circuit Court for Henry County**
**No. 13619     Julian P. Guinn, Judge**

_____

**No. W2004-02051-CCA-R3-CD  - Filed September 22, 2005**
_____

Following a jury trial, Defendant was convicted of aggravated robbery, a Class B felony.  The trial court sentenced Defendant as a Range II, multiple offender to seventeen years in the Tennessee Department of Correction.  Defendant does not challenge the length of his sentence.  In this appeal, Defendant argues (1) that the evidence was insufficient to support his conviction of aggravated robbery; (2) that the indictment fails to state an offense; and (3) that the State failed to prove beyond a reasonable doubt that the charged offense occurred prior to the return of the indictment.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Anthony L. Clark, Paris, Tennessee, for the appellant, Mike Edwards.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

### I.  Background

Cheryl Ann Webber testified that Defendant stopped by her house in May 2003, after a tornado struck the community and damaged the roof of her house.  Defendant offered to repair the Webber's roof, but Mrs. Webber's husband told Defendant that he had already hired someone else to do the repairs.  On August 6, 2003, Defendant and another man knocked on her door between 8:00 p.m. and 9:00 p.m.  Ms. Webber said she did not know Defendant's companion, and she described him as "quite a bit smaller, thinner, [and] younger" than Defendant.  The other man was later

identified as Christopher Wilson. Defendant asked to speak to Ms. Webber's husband. Ms. Webber told Defendant that the roof had been repaired, and she shut and locked the door.

Henry Webber said that he did not know that Defendant and Mr. Wilson had visited the house earlier in the evening because he was working on his computer. Around 11:00 p.m., a man, later identified as Mr. Wilson, knocked on the door and told Mr. Webber he needed to use the telephone because his car had broken down. Mr. Webber turned to reach for the portable telephone, and Mr. Wilson followed him into the house. Mr. Wilson pushed a few numbers on the telephone, and Mr. Webber told him that he had to turn the telephone on before it would work. Mr. Wilson raised his right hand at that point, and Mr. Webber saw that he was armed with a knife.

Ms. Webber, who had already gone to bed, woke up when she heard the second knock at the door. Ms. Webber said she was very frightened when she saw the man's knife, and she thought the intruder was going to kill her and her husband. Both of the victims testified that Mr. Wilson was nervous, and told them that he "had never done anything like this." Mr. Wilson told the victims that if he did not get some money, "they'll kill me when I go out." Mr. Webber, a retired Methodist minister, engaged Mr. Wilson in conversation. He asked Mr. Wilson what he would do if he harmed Mr. Webber. Mr. Wilson responded that he "would probably go home and commit suicide." As they talked, Mr. Wilson kept asking for forty dollars.

Mr. Wilson followed Mr. Webber into the den, and Mr. Webber removed twelve dollars from his billfold. Mr. Webber asked Ms. Webber if she had any money, and all three went into the kitchen. Ms. Webber gave Mr. Wilson twenty dollars from her purse and told Mr. Wilson that she had some dollar bills in her bedroom that she had set aside for her Sunday school offering. The group went into Ms. Webber's bedroom, and she handed Mr. Wilson some one dollar bills. Mr. Wilson said that he had enough money. He told the victims that "they told me to cut your telephone line outside." Instead, Mr. Wilson cut the telephone line between the receiver and phone set of one of the victims' telephones. Mr. Wilson left through the front door. Mr. Webber followed him on to the porch, but Mr. Wilson told him to please go back inside the house. Mr. Wilson then ran around the house to the alley.

Mr. Webber called 911 from another telephone and described Mr. Wilson to the police dispatcher. Mr. Webber said that he was not scared of Mr. Wilson, and Mr. Wilson did not make any menacing gestures with his knife. Mr. Webber said that he knew Defendant because Defendant used to come by his house periodically asking for money. He did not know Mr. Wilson. Mr. Webber said that Mr. Wilson always said "they" were going to get him.

Mr. Wilson testified that he was Defendant's cousin. He and Defendant spent the day of the offense together, drinking and using drugs. In the early evening, they ran out of drugs. Defendant said he had to use the telephone, so he and Defendant drove to the Webbers' house in Defendant's red Chevrolet Blazer. Afterwards, they returned to Defendant's trailer. Defendant got a knife and handed it to Mr. Wilson. Defendant told Mr. Wilson that he wanted Mr. Wilson to go back to the Webber's house and get some money.

Defendant drove his Blazer to the Webber's and parked in the alley behind the house. Mr. Wilson said that Defendant told him "to cut the phone lines, go in, demand money, and act serious." Mr. Wilson said that Defendant warned him, "[a]nd if not, you know, you better come out with some money, you know, or you'll wish you didn't." Mr. Wilson said, it was "either to do something that I'll regret for the rest of my life or possibly get beat down right good." Mr. Wilson was too scared to tell Defendant he did not know how to cut the telephone line.

Mr. Wilson said that he knocked on the door and told Mr. Webber he needed to use the telephone. After he came into the house, Mr. Wilson told Mr. Webber he was sorry, but he had to take Mr. Webber's money, and that he had no choice. Mr. Wilson asked Mr. Webber not to shoot him.

After he got some money from the victims, Mr. Wilson ran back to Defendant's vehicle in the alley. He threw the knife away in the victims' backyard and gave Defendant the money. Defendant sped out of the alleyway, and drove to the apartments where Mr. Wilson's mother lived. Mr. Wilson said he and Defendant were arrested there a short time later. Mr. Wilson said Defendant was talking to his wife on the telephone when the police arrived and told Mr. Wilson to "run, run, run."

Mr. Wilson said that he and Defendant spent the night in jail. While they were being transported to the courthouse the next morning, Defendant "was steady looking at me like this right here, if you say one word, you know you're through." Mr. Wilson said he initially told the judge that Defendant did not have anything to do with the robbery because he was scared. Mr. Wilson said, "you know, I'd as soon do the time than get killed."

Chad Wesley Howard, the dispatcher for the Paris police department, received a 911 call from Mr. Webber at 11:42 p.m. on August 6, 2003. Mr. Webber said that a man wearing blue jeans, a baseball cap and a white t-shirt had robbed him in his home at knife point. Mr. Webber said the knife was a hunting-type knife with a five inch blade. Mr. Webber told the dispatcher that the man ran towards the back of the house and told Mr. Webber "that there was [sic] some guys out there in the car that were going to kill him if he didn't do it." Mr. Webber said the man was "very drunk" and took about forty dollars from the Webbers. Police officers arrived at the Webber residence on Dunlap Street before he and Mr. Webber finished their conversation.

A woman called the dispatcher at 11:55 p.m. and again at 11:58 p.m. about "the Dunlap [Street] thing." Mr. Howard said that he had gone to school with Jennifer Edwards, Defendant's wife, and recognized her voice. Officer Angie Myrick answered Ms. Edwards' first call, and Officer Howard answered the second call. Ms. Edwards told Officer Myrick that she was listening to her scanner, and she told her "the subject is in a red Tahoe Blazer, there's no tags in it." She said that she had made the men leave her house and they were driving "toward Dunlap from Old Mckenzie [Highway]."

[OFFICER MYRICK]:          Okay. You don't know their name[s] though?

| | |
|---|---|
| [MS. EDWARDS]: | It was [Defendant], he's driving it, but I don't want that told because I'm his wife, and I've got kids here, and I'm sick of this. |
| [OFFICER MYRICK]: | Okay. I'll let them know. |
| [MS. EDWARDS]: | He's [referring to Mr. Wilson] got on a white tee-shirt, the blue hat and everything. |

A few minutes later, Ms. Edwards called again and told Officer Howard that she thought the second man's name was Christopher, and that he was Larry Bowden's step-son. Officer Howard asked Ms. Edwards again who was driving the vehicle, and Ms. Edwards said that Defendant was.

Officer Patrick Joseph Burns was taking Mr. Webber's statement when he received a call that two possible suspects had been apprehended at Thomas Cove about a mile or one-half mile from Mr. Webber's house. Officer Burns drove Mr. Webber to the apartment complex, and Mr. Webber identified Mr. Wilson as his assailant.

Officer Burns said that Defendant and Mr. Wilson were read their Miranda rights at the apartment. Defendant said that he did not know what was going on but identified the red Blazer as his vehicle. Mr. Wilson said that he robbed the Webbers because he wanted Defendant to beat up his step-father, Larry Bowden, and Mr. Wilson was too small to do it. Mr. Wilson said that at Defendant's house he took off the clothes he was wearing when he robbed the Webbers, and Defendant told him that he was going to burn the clothes. The sequence of events occurring after Mr. Wilson entered the Webber's home which was relayed to Officer Burns by Mr. Wilson was consistent in most part with Mr. Webber's description of the offense.

Officer Burns said that Mr. Wilson threw about twenty dollars in different denominations down on the ground before he was arrested. Defendant also had twenty dollars in his pocket. Officer Burns said that Ms. Edwards found a white tee-shirt and blue baseball cap behind the shed on their property and turned the clothes over to the police on August 11, 2003.

On cross-examination, Officer Burns said that the knife was never found, and no witnesses other than Mr. Wilson saw the red Blazer in the vicinity of the Webber's home on the night of the offense.

The defense called Mary Delores Edwards, Defendant's mother, to testify. Ms. Delores Edwards said that Defendant came by her house "kind of late in the evening" on August 6, 2003, to pick up a check in the amount of twenty dollars. She said Defendant was alone.

Ms. Jennifer Edwards testified that Defendant was at home working in the yard when Mr. Wilson came over on August 6, 2003, between 6:30 p.m. and 7:00 p.m. She said Mr. Wilson had a bottle of vodka and was already intoxicated. Ms. Jennifer Edwards said that Defendant and Mr.

Wilson left in Defendant's truck to go see Mr. Webber about a roofing job and to buy cigarettes. They returned a short while later, and Mr. Wilson left. Defendant stayed at home.

Ms. Jennifer Edwards said that at about 10:30 or 11:00 p.m she heard the report of a robbery on Dunlap Street on her police scanner. The suspect was described as wearing a blue cap, a white t-shirt, and blue jeans. As she was listening to the report, Ms. Edwards said that Mr. Wilson "barged into" the house wearing the clothes described by the dispatcher. Ms. Edwards said, "you're the one that's on the scanner." Ms. Edwards said she was frightened and told Defendant to get Mr. Wilson out of the house. Defendant left the house with Mr. Wilson, and she called the police. She said she called the police because Mr. Wilson needed to be apprehended. Ms. Edwards denied that she told Officer Buford Taylor that Mr. Wilson and Defendant had robbed Mr. Webber when she gave Officer Taylor the clothes she found behind the shed on her property.

As rebuttal testimony, the State called Officer Taylor. He testified that he went to Ms. Jennifer Edwards' house on August 11, 2003, in response to her call that she had found a blue baseball cap and a white t-shirt. Officer Taylor said that Ms. Edwards' told him that those were the clothes Mr. Wilson was wearing when he and Defendant robbed the Webbers.

Ms. Brenda Faye Lee, also a rebuttal witness, testified that she was Mr. Wilson's aunt and Defendant's cousin. Ms. Lee said that Defendant and Mr. Wilson came by her apartment at Thomas Cove around 11:30 p.m. on August 6, 2003. The men said their car was broken down and they needed to use the telephone. Ms. Lee said that she asked what was wrong because Mr. Wilson "looked all blue around the mouth" and scared. Ms. Lee said that Defendant kept telling Mr. Wilson "to shut up and stop his crying." Defendant talked to his wife on the telephone, and Ms. Lee heard him say that the law was on the way. Both men ran out the door, but the police were already there. Ms. Lee said Defendant told Mr. Wilson that "he better keep his mouth shut."

As a surrebuttal witness, Ms. Delores Edwards testified that she did not hear Ms. Jennifer Edwards tell Officer Taylor that Defendant and Mr. Wilson had robbed the Webbers.

## II. Sufficiency of the Evidence

Defendant argues that the convicting evidence was circumstantial only and insufficient to show that Defendant participated in Mr. Wilson's robbery. Specifically, Defendant contends that there was no evidence that he was present at the scene of the crime. Consistently throughout his statement and testimony at trial, Mr. Wilson said "they" would kill him if he did not rob the victims, not "he" would kill him. Moreover, Defendant argues, that although the State was able to prove that Mr. Wilson committed aggravated robbery, the State did not prove that he intentionally or knowingly robbed Mr. and Mrs. Webber with a deadly weapon.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant was convicted of aggravated robbery which is defined as a robbery "accomplished with a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). The offense of robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a).

"A defendant is criminally responsible as a party to an offense and may be charged with commission of the offense where the offense is committed by another person for whom the defendant is criminally responsible." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing Tenn. Code Ann. § 39-11-401). "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

"Presence or companionship with the perpetrator of the felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Jones*, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999). It is not necessary for the criminally responsible defendant to take a physical part in the crime; "[e]ncouragement of the principal is sufficient." *Id.* (citing *State v. McBee*, 644 S.W.2d 425 (Tenn. Crim. App. 1982)).

Mr. Wilson's testimony provided direct evidence of Defendant's assistance and participation in the offense and that Defendant profited from the proceeds. It is well settled that "'a conviction may not be based solely upon the uncorroborated testimony of an accomplice.'" *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Viewing the evidence in a light most favorable to the State, the testimony of the victims corroborated Mr. Wilson's testimony that he entered the Webber residence under the pretext of using the telephone, that he pointed a knife at the victims and demanded money, and that he repeatedly said that he was being forced to commit the offense by someone else who was waiting for him outside. Ms. Webber said that she was frightened of Mr. Wilson because he was carrying a knife. Although Mr. Webber said that he was not scared of Mr. Wilson, the "pointing of a deadly weapon at the victim constitutes 'violence' as used in the offense of robbery pursuant to Tenn. Code Ann. § 39-13-401." *State v. Allen*, 69 S.W.3d 181, 186 (Tenn. 2002).

Jennifer Edwards testified that Mr. Wilson came over to her home during the early evening, and he and Defendant went to the Webber residence, returning together a short time later. Ms. Edwards told police officers that Mr. Wilson was wearing the clothing described by Mr. Webber, and that he and Defendant were riding in Defendant's red Blazer. Ms. Lee testified that Defendant and Mr. Wilson arrived at her home together around 11:30 p.m. on the night of the offense. Driving the perpetrator of an offense to and from the crime scene is sufficient to support a finding that the driver aided and participated in the offense. *See, e.g., State v. Andrew Thomas and Anthony Bond*, No. W2001-02701-CCA-R3-CD, 2004 WL 370297, at *53 (Tenn. Crim. App., at Jackson, Feb. 27, 2004), *perm. to appeal denied* (Tenn. Aug. 30, 2004); *State v. Harry L. Robinson*, No. 02C01-9807-CR-00206, 1999 WL 460087, at *3 (Tenn. Crim. App., at Jackson, July 8, 1999), *perm. to appeal denied* (Tenn. Nov. 22, 1999). Defendant talked with his wife, and then warned Mr. Wilson that the police were on their way and for Mr. Wilson not to say anything. Defendant had twenty dollars in his pocket when he was apprehended.

Based on our review of the record, the evidence was sufficient to support Defendant's conviction of aggravated robbery based on a theory of criminal responsibility.

## III. Sufficiency of the Indictment

Defendant argues that the indictment charging him with the offense of aggravated robbery was defective because it failed to state an offense, it contained language contradictory to the cited statute, and it combined statutory elements of more than one offense.

On March 1, 2004, the Henry County Grand Jury returned an indictment charging Defendant with aggravated robbery as follows:

> Acting with the intent to promote, assist or benefit in the proceeds or the results of the offense of AGGRAVATED ROBBERY, MIKE EDWARDS, heretofore, to wit: On or about the 6ᵀᴴ DAY OF AUGUST, 2003, in the County aforesaid, then and there did knowingly or intentionally solicit, direct, aid or attempt to aid CHRISTOPHER WILSON to commit theft of property, being MONEY, from HENRY AND ANN WEBER [sic], by the use of a deadly weapon, which was a KNIFE, thereby using violence against, or placing fear in HENRY AND ANN WEBER [sic], thereby committing the offense of AGGRAVATED ROBBERY, in

violation of T.C.A. 39-13-402(a)(1) against the peace and dignity of the State of Tennessee.

Defendant argues that the indictment is defective because it contains language from the statutory definition of criminal responsibility of a felony but only alleges the offense of aggravated robbery. Defendant's argument is premised on his contention that criminal responsibility of a felony and aggravated robbery are two separate offenses.

Under both the United States and the Tennessee Constitutions, a charging instrument, such as an indictment, must inform the accused of "the nature and cause of the accusation." *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition to these constitutional guarantees, Tennessee Code Annotated section 40-13-202 requires that an indictment

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court on conviction, to pronounce the proper judgment . . . .

Criminal responsibility is not a separate offense but merely a theory by which the State may prove the defendant's guilt of the alleged offense based upon the conduct of another person. *State v. Lemacks*, 996 S.W.2d 166, 173 (Tenn. 1999). An indictment need not set forth the theories available to support a conviction of the charged offense. *Id.* at 172. Accordingly, as a panel of this Court has previously concluded, "the language in [Defendant's] indictment suggesting the State's reliance upon a theory of criminal responsibility is mere surplusage." *State v. Barry Waters Rogers*, No. M1999-01389-CCA-R3-CD, 2000 WL 1612304, at *2 (Tenn. Crim. App., at Nashville, Oct. 30, 2000), *no perm. to appeal filed*. An indictment is not fatal because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged. *State v. Culp*, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994). Defendant's indictment sufficiently charges the statutory elements of aggravated robbery even after removal of the surplusage, and includes an appropriate citation to the statute. *See State v. Griffis*, 964 S.W.2d 577, 591 (Tenn. Crim. App. 1997) ("As a general rule, it is sufficient to state the offense in the words of the statute, or words which are the equivalent to the words contained in the statute.") We conclude that the indictment is sufficient.

Defendant also argues on appeal that he was not granted a preliminary hearing on the charge of aggravated robbery. He concedes that he had a preliminary hearing, but argues that it was only on the charge of criminal responsibility for facilitation of a felony, a less serious charge. Defendant contends, therefore, that the trial court erred in not granting him a new preliminary hearing.

First, we note that Defendant does not cite any authority or make any references to the record in support of his argument. "[I]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7). Nonetheless, Defendant would not be entitled to relief were we to consider his issue on the merits.

The right to a preliminary hearing is dealt with in Rules 5 and 5.1 of the Tennessee Rules of Criminal Procedure. These rules contemplate the right of a preliminary hearing when a defendant is arrested before a grand jury can make a determination of probable cause. *See* Tenn. R. Crim. P. 5(c)(2). The State cannot avoid the requirement of a preliminary hearing by acting in bad faith, such as submitting the case to a grand jury while the preliminary hearing is pending, *State v. Brooks*, 880 S.W.2d 390, 394 (Tenn. Crim. App. 1994), or when the State deliberately does not oppose a motion to suppress, lets the case be dismissed in general sessions court, and then takes the case to the grand jury. *State v. Golden*, 941 S.W.2d 905, 907-08 (Tenn. Crim. App. 1996). There is nothing to indicate in the case *sub judice* that the State acted in bad faith in "upgrading" the offense from facilitation of aggravated robbery to aggravated robbery.

## IV. Failure to Prove the Offense Occurred prior to the Return of the Indictment

Defendant argues for the first time on appeal that the State failed to prove beyond a reasonable doubt that the charged offense of aggravated robbery occurred prior to the return of the indictment. Defendant contends that this issue rises to the level of plain error under Rule 52(b) of the Tennessee Rules of Criminal Procedure. Relying on *State v. Brown*, 53 S.W.3d 264 (Tenn. Crim. App. 2000), Defendant asks this Court to reverse his conviction and remand for a new trial.

Rule 52(b) provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." "Plain error review extends only to a clear, conspicuous, or obvious error which affects the substantial rights of the defendant." *State v. Gomez*, 163 S.W.3d 632, 645 (Tenn. 2005). A "substantial right" is a right of fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Five factors must be considered in determining whether an error is plain:

a) the record must clearly establish what occurred in the trial court;

b) a clear and unequivocal rule of law must have been breached;

c) a substantial right of the accused must have been adversely affected;

d) the accused [must not have waived] the issue for tactical reasons; and

e) consideration of the error must be "necessary to do substantial justice."

*Id*; at 641-42 (quoting Tenn. R. Crim. P. 52(b), remaining citations and footnotes omitted).

Tennessee Code Annotated section 39-11-201 provides that "[n]o person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt: . . . the offense was committed prior to the return of the formal charge." In *Brown*, this Court thus found "that our

legislature has mandated that before a person can be convicted of a criminal offense, the State must prove beyond a reasonable doubt that the person committed the offense prior to the time he or she was formally charged with the offense." *Brown*, 53 S.W.3d at 278.

This burden is generally, and easily, fulfilled by reading the indictment to the jury after the jury is sworn in. *Id*. at 279 (citing David L. Raybin, *Tennessee Criminal Practice and Procedure*, § 26.10.) Although Defendant in the case *sub judice* argues that his indictment does not indicate that the offense occurred before the return date, the face of the indictment clearly states that the offense occurred on or about August 6, 2003, and the indictment was returned by the grand jury on March 1, 2004. However, the State concedes that the indictment was not read to the jury, and the record does not indicate that the jury was shown the indictment.

Nonetheless, in the event the indictment is not read or shown to the jury, the State may satisfy its burden of proof by "merely ask[ing] an appropriate witness whether the actions of the defendant constituting the offense occurred before the defendant was charged with the offense." *Id*.

Officer Burns testified that he took Mr. Webber over to Thomas Cove where Defendant and Mr. Wilson had been apprehended within thirty minutes of the robbery on August 6, 2003. The following dialog occurred:

[STATE]: Now, what did you first charge [Defendant] with by way of criminal offenses?

[OFFICER BURNS]: Charged him with criminal responsibility for the facilitation of a felony.

[STATE]: And what else did you charge him with, if anything, relating to that –

[OFFICER BURNS]: I believe that was it, at that time.

[STATE]: Now, who ultimately makes the decision about what the proper charge is with respect to prosecution of criminal cases here in Henry County?

[OFFICER BURNS]: The District Attorney's Office.

[STATE]: And after conferring with the DA's office, was that charge amended or changed to aggravated robbery?

[OFFICER BURNS]: Yes, it was.

Based on the foregoing, we conclude that the State proved beyond a reasonable doubt that the offense was committed prior to the return of the formal charge. Therefore, there is no plain error. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE